IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| ALLIED ERECTING AND DISMANTLING CO., | ) ) ) | |
|---|---|---|
| Plaintiff, | ) ) | No. 2:16-cv-01379-DSC-RCM |
| v. | ) ) ) | Judge David S. Cercone<br>Magistrate Judge Robert C. Mitchell |
| UNITED STATES STEEL CORP., | ) ) | Docket No. 40 |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

**I.    Recommendation**

It is respectfully recommended that United States Steel Corporation's ("U.S. Steel") Rule 12(b)(6) motion to dismiss (Docket No. 40) be granted with prejudice as to the following portions of Allied Erecting and Dismantling Company's ("Allied") complaint (Docket No. 1): Count III ¶ 34(6), the weather-delay aspect of Count III ¶ 34(13–14), and Count V ¶ 58(1–5); U.S. Steel's Rule 12(b)(6) motion to dismiss as to Count III ¶ 34(1–5, 7–10, 12–14) (including all non-weather-delay aspects of ¶ 34(13–14)) should be denied. It is also respectfully recommended that U.S. Steel's Rule 12(e) motion for a more definite statement (Docket No. 40) as to Count I be denied.

**II.    Report**

**A.    Introduction**

This is a breach-of-contract action brought by Allied against U.S. Steel. The parties' latest skirmish in a long, conflict-ridden saga features U.S. Steel's Rule 12(b)(6) motion to dismiss (Docket No. 40) substantial portions of Counts III and V in Allied's complaint (Docket No. 1). The motion to dismiss should be granted in part and denied in part. U.S. Steel also

moves under Rule 12(e) for the Court to order Allied to provide a more definite statement (Docket No. 40) of Count I (Docket No. 1). The Rule 12(e) motion should be denied.

**B.     Background**

Allied is an Ohio corporation based in Youngstown, Ohio; U.S. Steel is a Delaware corporation based in Pittsburgh, Pennsylvania. (Docket No. 1 ¶¶ 1–2.) The parties have an over thirty-year-long relationship in which Allied dismantles U.S. Steel-owned sites. (Id. ¶¶ 5–6.) Allied's and U.S. Steel's relations are not always the epitome of business bliss; many feuds erupt between them. The United States District Court for the Western District of Pennsylvania ("Western District") presided over a lawsuit between the parties from 1993 through settlement in 2003. (Id. ¶ 6.) From this settlement sprung several long-term contracts for Allied to exclusively "perform additional dismantling work for U.S. Steel at all of U.S. Steel's sites in the United States." (Id. ¶ 7.) These contracts included the 2003 Agreement in Principle ("AIP"), 2004 AIP, and the 2004 Dismantling Services Agreement ("DSA"). (Id.) Allied performed over 700 dismantling projects for U.S. Steel for several years after the parties implemented the 2003 and 2004 AIPs and 2004 DSA. (Id. ¶ 8.) Following this success, the parties executed the 2010 DSA, through which Allied received the exclusive right to dismantle U.S. Steel facilities throughout the United States "on a 'last look' basis" through 2015. (Id. ¶ 9.)

The parties had one notable problem: dismantling the Sheet and Tin Project at U.S. Steel's Fairless Works facility in Fairless Hills, Pennsylvania. (Id. ¶ 10.) What was supposed to be a three-year job continued seven years due to U.S. Steel's "various delays and impacts." (Id.) Allied sued U.S. Steel for these Fairless Works problems in the United States District Court for the Northern District of Ohio ("Northern District of Ohio") (the "2012 action"). (Id. ¶ 12; Docket No. 9-2 at 2–3.) Allied accuses U.S. Steel of retaliating against it for filing the 2012

2

action by violating its contractual rights under the 2003 AIP (as to Fairless Works) and 2010 DSA. (Docket No. 1 ¶ 12.) These violations include:

> denying Allied's last look rights under the 2010 DSA for barge and railcar work . . . and other dismantling projects under the 2010 DSA; refusing to pay Allied for work performed and invoices submitted; refusing to compensate Allied for valid additional compensation requests on several project sites; and insisting that Allied perform certain work at the Fairless Works at 'no-cost,' despite . . . U.S. Steel . . . previously compensat[ing] Allied for similar work prior to . . . the filing of the 2012 [action]."

(Id.) Allied subsequently brought this lawsuit. (Id. at 1.)[1]

In Count III, Allied alleges U.S. Steel breached express and implied contractual obligations by delaying and hindering its work on several projects throughout the Midwestern United States and denying requests for increased compensation for them due to U.S. Steel's actions. (Docket No. 1 ¶ 34.) These projects include:

(1) Stockhouse Bins (GY11.39) at Gary related to U.S. Steel Purchase Order No. 20011950, Allied's request for Change Order No. 1 – additional time due to Plant delays in September and October 2012 [Docket No. 1-2] . . .

(2) Stockhouse Bins (GY11.39) at Gary related to Purchase Order No. 20011950, Allied's request for Change Order No. 2 – additional time due to Plant delays in November 2012 [Docket No. 1-3] . . .

(3) Stockhouse Bins (GY11.39) at Gary related to U.S. Steel Purchase Order 20011950, Allied's request for Change No. 3 – additional time due to Plant delays in December 2012 [Docket No. 1-4] . . .

(4) Sulphate Building Phase 4 Part A (GL03.76) at Great Lakes related to U.S. Steel Purchase Order No. 1254141, Allied's request for Change Order No. 1 – delay due to discovery of asbestos [Docket No. 1-5] . . .

---

[1] We granted U.S. Steel's motion to transfer this matter to the Northern District of Ohio in December 2016 as related to the 2012 action. (Docket No. 29.) In July 2017, the latter court returned this matter to this court. (Docket No. 56.)

(5) Sulphate Building Phase 4 Part A (GL03.76) at Great Lakes related to U.S. Steel Purchase Order No. 1254141, Allied's request for Change Order No. 2 – change in dismantling method due to structural steel so deteriorated that it had to be lifted down, not dropped [Docket No. 1-6] . . .

(6) #4 Stack (GL03.75) at Great Lakes related to U.S. Steel Purchase Order No. 1243973, Allied's request for Change Order No. 1 – Change in Scope – additional time due to weather delays [Docket No. 1-7] . . .

(7) Magnetic Separator Roll Removal Project (MN03) at Minntac related to canceling U.S. Steel Purchase Order No. 02167260, and Allied's request for Change Order No. 1 – additional scrap hauling; violations of the 2010 DSA including Section E; and U.S. Steel wrongfully locked out Allied [Docket No. 1-8] . . .

(8) Magnetic Separator Roll Removal Project (MN03) at Minntac related to canceling U.S. Steel Purchase Order No. 02167260, and Allied's request for Change Order No. 2 – additional one week added to end of schedule; U.S. Steel violated the 2010 DSA including Section E; U.S. Steel wrongfully locked out Allied [Docket No. 1-8] . . .

(9) Magnetic Separator Roll Removal Project (MN03) at Minntac related to canceling U.S. Steel Purchase Order No. 01267260, and Allied's request for Change Order No. 4 – additional manpower and equipment; U.S. Steel violated the 2010 DSA including Section E; U.S. Steel wrongfully locked out Allied [Docket No. 1-8] . . .

(10) Magnetic Separator Roll Removal Project (MN03) at Minntac related to canceling U.S. Steel Purchase Order No. 01267260 and denying change order requests; Work[] performed by Jamar Company; U.S. Steel violated the 2010 DSA including Section E and wrongfully locked out Allied [Docket No. 1-8] . . .

(12) #2 Ore Dock Trestle (GL03.60) at Great Lakes related to U.S. Steel Purchase Order No. 454708 Rel. 26, Allied's request for Change Order No. 1; Additional costs due to U.S. Steel delays in purging the line [Docket No. 1-9] . . .

(13) #2 Coke Battery Screening Station (GL03.77) at Great Lakes related to Purchase Order No. 20225783, Allied's request for Change Order . . . No. 1 – Additional

> compensation for delays due to asbestos abatement, changes in schedule and methods of work [Docket No. 1-10] . . . and
>
> (14) Main Plant – 36 inch COG line removal (GL 05.50) at Great Lakes related to Purchase Order No. 20215473, Allied's request for Change Orders Nos. 2 (U.S. Steel delays, changes in methods) and 3 (U.S. Steel delays, changes in methods) . . . [Docket No. 1-11].[2]

(Docket No. 1 at 9–11.) Allied does not allege it requested change orders before commencing the projects at issue. (Docket Nos. 1-2; 1-3; 1-4; 1-5; 1-6; 1-7; 1-8; 1-9; 1-10; 1-11.)

Allied's change-order requests provide context for the subparagraphs above. "Plant Operations" caused the delays Allied alleged in subparagraphs one through three. (Id. at ¶ 34(1–3); Docket Nos. 1-2, 1-3, 1-4.) Allied's discovery of asbestos-containing material U.S. Steel was supposed to remove delayed the projects in subparagraphs four and thirteen. (Docket No. 1 at ¶ 34(4, 13).)

Focusing on the subparagraph-four project, Allied discovered the asbestos-containing materials as it was performing the job; "U.S. Steel requested a [47]-day delay". (Docket No. 1-5 at 1.) Allied referred to a "Request for Quote, dated 12/4/2013 . . . [that] specifically states 'Change orders will not be granted unless US Steel requests a change in: project scope; methods; schedules; or dismantling plans.'" (Id.) Allied also requested compensation because U.S. Steel took "13 GT of ferrous material" even though pre-bid meeting minutes indicated that Allied "'will assume ownership of all ferrous and nonferrous material.'" (Id. at 2.)

As for the subparagraph-thirteen job, Allied noted that U.S. Steel directed changes to how Allied would pull down a structure and asked that Allied's crane be moved to the structure's southern side while its "transite stack is abated." (Docket No. 1-10 at 1.) The abatement was

---

[2] Subparagraph 11 is missing from this list because U.S. Steel does not seek its dismissal. (Docket No. 40 at 1.)

completed "42 working days later." (Id.) U.S. Steel also caused delays while "all . . . Managers were in a safety meeting" and Allied could not sign in with them to begin working on March 18, 2015 and when "a US Steel furnace was down" on March 20, 2015. (Id. at 2.) Delays due to "extreme weather (subzero temperatures and wind chill factors) from 2/12/15 thru [sic] 2/24/15" also occurred. (Id. at 1.) Finally, Allied alleged $71,872 in lost scrap value because U.S. Steel "wait[ed] a year from [Allied's] acceptance of the project (December 2013) before awarding the project (December 2014)." (Id. at 2.)

Allied's change-order request related to subparagraph five asks for additional compensation "for US Steel's requested Change in Method" because structural steel Allied was dismantling was so deteriorated that it needed to be lifted down instead of dropped. (Docket Nos. 1 at ¶ 34(5); 1-6.) Allied's change-order request underlying subparagraph six mentions changes in scope because of "weather delays over the 5% allowance" and more loading time for two radioactive concrete loads rejected by a landfill. (Docket Nos. 1 at ¶ 34(6); 1-7.)

Facts contained in change-order requests pertinent to Allied's allegations in subparagraphs seven through ten will be grouped together as they all relate to a magnetic-roll-separator project. U.S. Steel directed that Allied move a scrap-processing area 1.31 miles further away, increasing equipment and operator time for scrap transport. (Docket No. 1-8 at 4.) U.S. Steel added an extra week plus more equipment and manpower costs to this project. (Id. at 5.) In a May 21, 2014 change-order request, Allied asked for an additional crew because of "US Steel's requested Change in Scope/Methods" at the magnetic-separator-roll project. (Id. at 6.) Subparagraph ten alleges U.S. Steel wrongfully locked out Allied and references work "performed by Jamar Company" Allied refused to pay backcharges for. (Docket Nos. 1 ¶ 34(10); 1-8 at 1.)

6

Allied's charge-order request related to subparagraph twelve asks that U.S. Steel reimburse it for extra manpower and equipment costs to remove a COG line. (Docket No. 1-9.) Material within the COG line "made it more difficult to remove." (Id.) Allied averred in subparagraph twelve that U.S. Steel delayed purging the COG line, which corresponds to the increased costs Allied allegedly bore in removing it. (Docket No. 1 at ¶ 34(12).)

As for subparagraph fourteen, the final subparagraph at issue in Count III, Allied alleged it provided notice to U.S. Steel of all delays and project-methods changes it attributed to U.S. Steel on a thirty-six inch COG line removal project. (Docket Nos. 1 ¶ 34(14); 1-11 at 8.) Most of the alleged delays stem from U.S. Steel's actions, though one on November 24, 2014 was due to high winds and heavy rain. (Docket No. 1-11 at 4–5.)

Count V focuses on the dismantling project at Fairless Works. (Docket No. 1 at 14.) The 2003 AIP requires Allied to perform "'any further dismantling work'" at Fairless Works "'regardless of time.'" (Id. ¶ 51.) This work is to be done "at no cost to U.S. Steel." (Id. ¶ 52.) In exchange, Allied received possession and title to ferrous scrap, non-ferrous scrap, and other recyclable materials from Fairless Works. (Id.)

The parties implemented the 2003 AIP by executing the 2004 DSA. (Id. ¶ 54.) 2004 DSA II(A), a provision describing Allied's dismantling duties at Fairless Works, states:

> (i) such dismantling work shall be at no cost to U.S. Steel (other than the costs hereinafter provided for in the remainder of this paragraph), (ii) concrete removal will be to top of floor slab, (iii) asbestos abatement, hazmat removal, utility relocation and/or new construction will be for U.S. Steel's account . . . .

(Docket No. 48 at 61.) Allied averred that the parties did not anticipate "controlled drops, partial strip-outs, hand dismantling techniques or other costly restrictions or limitations on Allied's dismantling work at Fairless Works due to . . . dismantling work in close proximity to live utilities . . . ." (Docket No. 1 ¶ 57.)

7

Allied's core allegations in Count V revolve around five no-cost purchase orders. (Id. ¶ 58(1–5).) Allied believes it should be compensated for performing these five jobs because "the dismantling work was to be performed in or around live utilities" requiring "piecemeal, controlled drops and/or hand dismantling techniques." (Id. ¶ 59.) Allied also claims U.S. Steel improperly locked it out of Fairless Works on January 1, 2014, preventing it from finishing its dismantling work, removing equipment, and collecting accumulated scrap, as it is contractually entitled to do. (Id. ¶¶ 61–64.)[3]

### C. Standard of Review

The Supreme Court of the United States ("Supreme Court") issued two decisions setting the standard of review for Rule 12(b)(6) motions for failure to state a claim upon which relief could be granted. The Supreme Court held that a complaint must include factual allegations that "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "[W]ithout some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice' but also the 'grounds' on which the claim rests." Phillips v. Cty. of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008). In determining whether a plaintiff meets this standard, a court must reject legal conclusions unsupported by factual allegations, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," "labels and conclusions," and "'naked assertion[s]' devoid of 'further factual enhancement.'" Iqbal, 556 U.S. at 678 (citations omitted). Mere "possibilities" of misconduct are insufficient. Id. at 679. The United States Court of Appeals for the Third Circuit summarized the inquiry as follows:

> To determine the sufficiency of a complaint, a court must take three steps. First, the court must "tak[e] note of the elements a

---
[3] U.S. Steel did not seek dismissal of Allied's Count V claim that U.S. Steel unlawfully locked out Allied from Fairless Works. (Docket No. 40 at 11 n.5.)

> plaintiff must plead to state a claim." Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1947, 173 L.Ed.2d 868 (2009). Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Id. at 1950. Third, "whe[n] there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." Id. This means that our inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged.

Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011). Complaints must be "construe[d] . . . in the light most favorable to the plaintiff" and contain "enough factual matter (taken as true) to suggest the required element[s] of the claims asserted." In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010) (internal quotation marks and citations omitted).

"In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citation omitted). The Court may consider documents Allied attached to its complaint when evaluating this Rule 12(b)(6) motion. (Docket Nos. 1-2; 1-3; 1-4; 1-5; 1-6; 1-7; 1-8; 1-9; 1-10; 1-11.)

**D.  Analysis**

*1.  Count V ¶ 58(1–5)*

Allied's breach-of-contract claims in Count V ¶ 58(1–5) should be dismissed with prejudice for two reasons. First, a prior judgment in the 2012 action indicates Allied breached the contractual provisions it intends to enforce here; issue preclusion allows that judgment to be recognized in this Court. Second, Pennsylvania law forbids a party from enforcing a contract provision that the party itself breached.

9

Issue preclusion allows a judgment from the 2012 action to carry over to this action. "Under federal common law, the elements of issue preclusion are: (1) identity of issues; (2) a final judgment on the merits; (3) identity (or privity) of parties; and (4) the party against whom preclusion is asserted had a full and fair opportunity to litigate the issue." Tucker v. Bristol-Myers Squibb, 143 F. App'x 411, 412 (3d Cir. 2005) (citing Delaware River Port Auth. v. Fraternal Order of Police, Penn-Jersey Lodge 30, 290 F.3d 567, 573 n.10 (3d Cir. 2002)).

All issue-preclusion elements are satisfied. First, whether the "no cost" provision of the 2003 AIP and the 2004 DSA was breached was an issue in the 2012 action as it is here. (Docket Nos. 1 at 14–16; 9-8 at 5–6). Second, Judge Lioi entered a final judgment on the merits in the 2012 action, which indicated Allied breached the "no cost" provision in the 2003 AIP and the 2004 DSA. (Docket Nos. 9-8 at 3, 5–9; 48 at 60, 106; 369 (Case No. 12-1390, 2012 action).) Third, Allied and U.S. Steel opposed each other in the 2012 action and are opponents in this action. (Docket No. 9-8 at 2.) Fourth, Allied had a full and fair opportunity to litigate whether it breached the "no cost" provision in the 2003 AIP and 2004 DSA as evidenced by a jury verdict on that issue. (Id. at 5–6.) Allied's breach of the "no cost" provision in the 2003 AIP and 2004 DSA in the 2012 action applies here via issue preclusion.

Allied is not able to enforce contractual provisions against U.S. Steel that Allied itself breached. "The rule in Pennsylvania . . . is that when parties to a contract each commit a material breach, the law will give relief to neither party." Cottman Transmission Sys., Inc. v. Dubinsky, 550 F. Supp. 133, 136 (E.D. Pa. 1982) (citing Auto. Devices Co. v. Auto. Devices Co. of Pa., 292 F.2d 663, 665 (3d Cir. 1961)). Stated differently, "[a] party . . . may not insist upon performance of the contract when he himself is guilty of a material breach of the contract." Ott v. Buehler Lumber, 541 A.2d 1143, 1145 (Pa. Super. Ct. 1988). A jury found in the 2012 action

that Allied breached the "no cost" provision in the 2003 AIP and 2004 DSA. (Docket No. 9-8 at 5–6.) That verdict, which has issue-preclusive effect, prevents Allied from enforcing the "no cost" provision of the 2003 AIP and 2004 DSA against U.S. Steel in this action. Therefore, the Court should grant U.S. Steel's Rule 12(b)(6) motion to dismiss with prejudice Allied's claims in Count V, ¶ 58(1–5).[4] (Docket No. 1 at 14–16.)

2. *Count III ¶ 34(1–10, 12–14)*

Allied's claims in Count III ¶ 34(1–10, 12–14) allege that U.S. Steel wrongfully denied numerous requests for change orders on jobs throughout the Midwestern United States. U.S. Steel seeks to dismiss these claims for two reasons. First, Judge Lioi dismissed a change-order claim Allied brought in the 2012 action because Allied requested the change order after it completed the work associated with the change order, contravening the 2010 DSA and 2003 Blanket Agreement. (Docket No. 40 at 9–10.) Issue preclusion bars Allied from relitigating this identical issue. (Id.) Second, the plain language of the 2010 DSA and the 2003 Blanket Agreement prohibits Allied from recovering on its change-order claims since Allied requested change orders after completing projects instead of before commencing them. (Id.)

Allied argues that its change-order claims should advance to discovery. First, plain language in neither the 2010 DSA nor the 2003 Blanket Agreement precludes Allied's change-order claims. (Docket No. 43 at 11–14.) Second, contractual requirements to submit

---

[4] Allied alleged U.S. Steel compensated it for performing dismantling work near live utilities before the 2012 action, which is similar work to what Allied contends it should be paid for here. (Docket Nos. 1 at ¶¶ 57–60.) Even if that is true, U.S. Steel did not bind itself to pay Allied for further dismantling work it performed near live utilities at Fairless Works. Under the parties' 1993 Blanket Agreement, any failure by U.S. Steel (the purchaser) to enforce the agreement's terms "shall not constitute a waiver." (Docket No. 48 at 134.) The 2004 DSA and 2003 AIP renewed the Blanket Agreement, making it applicable to the 2004 DSA and 2003 AIP. (Id. at 63, 105.) The Blanket Agreement can only be modified in writing with U.S. Steel's signature. (Id. at 134.)

11

written change orders prior to commencing work subject to the change order are excused under Pennsylvania case law when the owner (U.S. Steel) delays or disrupts the contractor's (Allied's) work or directs the contractor to complete the project without a change order. (Id. at 14–17.) Third, Judge Lioi's ruling in the 2012 action that an untimely written change order must be dismissed under the 2010 DSA and 2003 Blanket Agreement does not have issue-preclusive effect because the factual allegations in this action differ from those in the 2012 action. (Id. at 17–18.) This argument implies that an identical issue was not litigated.

U.S. Steel replied that "there are no allegations that [it] directed Allied to perform the extra work in Count III, ¶¶ 34(1)[–](10) and 34(12)[–](14)." (Docket No. 44 at 8) (emphasis removed).

Taking the parties' contentions out of order, issue preclusion does not preclude Allied from pursuing its change-order claims in Count III, though it does apply to Judge Lioi's ruling in the 2012 action that the 2010 DSA requires written change orders. Here, the parties battle over whether: (1) contractual language requires Allied to acquire written, mutually-agreed change orders prior to commencing projects the change orders described and (2) U.S. Steel's alleged directions, delays, and interference excused Allied from procuring timely written change orders. See supra pp. 11–12.

In the 2012 action, Judge Lioi considered whether the 2010 DSA required Allied to submit a change order to be compensated for its extra work dismantling unanticipated amounts of scrap. (Docket No. 9-2 at 28–31.) Allied twice asked for extra compensation (presumably through change-order requests); U.S. Steel denied Allied's requests. (Id. at 29.) U.S. Steel argued that Section 3(C) of the 2010 DSA requires the parties to agree on all change orders prior to "commenc[ing] . . . work required by reason of the change order." (Id.) U.S. Steel refused to

issue a change order to Allied on that basis and concluded that Allied did not "state a claim for relief under the contract." (Id.) Judge Lioi held that "[t]he 2010 DSA clearly requires written change orders." (Id. at 30.) She did not excuse Allied from acquiring written change orders based on Allied's allegations in the 2012 action. (Id. at 30–31.)

Judge Lioi's ruling in the 2012 action on the 2010 DSA's written-change-order requirement applies here through issue preclusion. See supra p. 10 (depicting issue-preclusion elements). First, the parties are litigating the same issue now as they litigated in the 2012 action: whether the 2010 DSA requires written change orders to be procured prior to Allied commencing the work described in its change-order requests. Id. at 11; (Docket No. 43 at 11–14.) Second, Judge Lioi entered a final judgment on the merits in the 2012 action, which encompassed her 2010 DSA decision that Allied could not be compensated for extra work without a corresponding written change order. (Docket Nos. 9-2 at 30; 369 (Case No. 12-1390, 2012 action).) Third, as already stated, Allied and U.S. Steel opposed each other in the 2012 action just as they do now. See supra p. 10; (Docket No. 9-8 at 2.) Fourth, Allied had a full and fair opportunity to litigate the 2010 DSA's written-change-order requirement in the 2012 action since it defended its complaint in a written brief against U.S. Steel's motion to dismiss. (Docket No. 9-2 at 28–31.) Judge Lioi's holding in the 2012 action that "[t]he 2010 DSA clearly requires written change orders," (Docket No. 9-2 at 30), precludes Allied from relitigating that issue.

Judge Lioi left open the possibility that Pennsylvania law could permit breach-of-contract claims even if Allied did not submit timely, written change orders as contractually required. She cited two Pennsylvania cases supporting this proposition: James Corp. v. N. Allegheny Sch. Dist., 938 A.2d 474 (Pa. Commw. Ct. 2007) and Coatesville Contractors & Eng'rs, Inc. v. Borough of Ridley Park, 506 A.2d 862 (1986). She acknowledged Allied did not allege U.S.

13

Steel directed it to perform extra work or "affirmatively interfered with and prevented" it from completing its work. (Docket No. 9-2 at 31.) As a result, Allied lacked a legal excuse for proceeding on work without a written change order and granted U.S. Steel's Rule 12(b)(6) motion. (Id.)

Issue preclusion does not stop Allied from litigating its change-order claims here because Allied's factual allegations differ from its factual allegations in the change-order portion of the 2012 action. Allied does not dispute that it submitted change-order requests to U.S. Steel after proceeding with work subject to those requests. (Docket Nos. 1-2; 1-3; 1-4; 1-5; 1-6; 1-7; 1-8; 1-9; 1-10; 1-11.) Nevertheless, Allied's complaint and attached change-order requests contain numerous allegations that U.S. Steel delayed, redirected, and prevented it from completing its work as bid. (Docket Nos. 1 ¶ 34(1–5, 7–9, 10, 12–14); 1-2; 1-3; 1-4; 1-5; 1-6; 1-8; 1-9; 1-10; 1-11.) Judge Lioi did not rule on similar allegations in the 2012 action. (Docket No. 9-2 at 31.) U.S. Steel's attempt to defeat Allied's change-order-based claims via issue preclusion fails.

Contractors can avoid written-notice requirements (such as requests for change orders) under Pennsylvania law based on an owner's conduct. In James Corp., a construction contract's written notice provisions were informally satisfied because a school district knew the facts causing construction delays and claims for accelerated work, caused the delays by not acting, and showed no prejudice from a contractor's failure to provide written damages claims. 938 A.2d at 486–87. The Commonwealth Court of Pennsylvania in James Corp. added that: "[s]chool [d]istrict, having directed [c]ontractor to perform the additional work asserting it was required by contract, cannot now disavow liability for costs incurred by claiming [c]ontractor did not have written authorization." Id. at 487 (citing A.G. Cullen Constr. Co. v. State Sys. of Higher Educ., 898 A.2d 1145, 1171 (Pa. Commw. Ct. 2006), disapproved on other grounds by A. Scott Enters.,

14

Inc. v. City of Allentown, 142 A.3d 779, 790 (Pa. 2016)). A few Supreme Court of Pennsylvania cases address similar issues. "[W]hen an owner requests a builder to do extra work, promises to pay for it and watches it performed knowing that it is not authorized in writing, he cannot refuse to pay on the ground that there was no written change order." Universal Builders, Inc. v. Moon Motor Lodge, Inc., 244 A.2d 10, 16 (Pa. 1968) (citing Focht v. Rosenbaum, 34 A. 1001 (Pa. 1896)); see also Henry Shenk Co. v. Erie Cty., 178 A. 662, 665 (Pa. 1935) ("[W]here an owner by an unwarranted positive act interferes with the execution of a contract[] or where the owner unreasonably neglects to perform an essential element of the work in furtherance thereof . . . he will be liable for the damages resulting therefrom."). These Pennsylvania cases show that contractors may recover damages from owners even when work is not authorized by a written change order when owners' actions indicate a written change order is unnecessary.

U.S. Steel argued "there are no allegations that [it] directed Allied to perform the extra work in Count III, ¶¶ 34(1)[–](10) and 34(12)[–](14)." (Docket No. 44 at 8) (emphasis removed). But taking Allied's allegations as true and construing them in the light most favorable to Allied, In re Ins. Brokerage Antitrust Litig., 618 F.3d at 314, most of them are sufficient to survive U.S. Steel's Rule 12(b)(6) motion to dismiss (Docket No. 40). A vast majority of Allied's claims under Count Three allege U.S. Steel neglected to perform its contractual duties (such as asbestos abatement) and delayed, changed, or interfered with the work Allied was supposed to perform. See supra pp. 3–7; (Docket Nos. 1 ¶ 34(1–5, 7–10, 12–14); 1-2; 1-3; 1-4; 1-5; 1-6; 1-8; 1-9; 1-10; 1-11.) These allegations indicate U.S. Steel was aware of delays and changes to Allied's work because U.S. Steel caused them. Id. Under Pennsylvania law, Allied's allegations—if proven true—would effectively nullify the contractual requirement that it procure a written change order before commencing a job differing from bid specifications. See supra

pp. 14–15. Discovery will reveal the merits of these claims and U.S. Steel's motion to dismiss should be denied as to them.[5]

The claim in Count III ¶ 34(6) should be dismissed with prejudice because it does not allege U.S. Steel delayed, directed, or interfered with Allied's work. This subparagraph and its underlying change-order request asks U.S. Steel for a change in scope because of "weather delays over the 5% allowance" and more loading time for two radioactive concrete loads rejected by a landfill. (Docket Nos. 1 at ¶ 34(6); 1-7.) U.S. Steel is unable to control the weather and Allied did not allege U.S. Steel irradiated two concrete loads to interfere with Allied's work. Thus, Allied's change-order claim at Count III ¶ 34(6) should be dismissed with prejudice.

The weather-delay aspect of Allied's claims listed in Count III ¶ 34(13–14) should also be dismissed with prejudice because, as stated above, U.S. Steel cannot prevent bad weather. (Docket Nos. 1 ¶ 34(13–14); 1-10 at 1; 1-11 at 4.)

   3. *Rule 12(e) Motion for More Definite Statement of Count I*

The Court should deny U.S. Steel's motion for Allied to produce a more definite statement (Docket No. 40) of Count I. Federal Rule of Civil Procedure 12(e) governs motions for more definite statements. It provides that:

> [a] party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response. The motion must be made before filing a responsive pleading and must point out the defects complained of and the details desired.

Fed. R. Civ. P. 12(e). Rule 12(e) motions are "perhaps the best procedural tool available to the defendant to obtain the factual basis underlying a plaintiff's claim for relief." Thomas v. Independence Twp., 463 F.3d 285, 301 (3d Cir. 2006).

---

[5] Allegations of weather-related delays related to subparagraphs thirteen and fourteen are not included in this conclusion. (Docket Nos. 1 ¶ 34(13–14); 1-10 at 1; 1-11 at 4.)

Case law sets a high bar for district courts to grant Rule 12(e) motions. "'The basis for granting [a Rule 12(e)] . . . motion is unintelligibility, not lack of detail. As long as the defendant is able to respond, even if only with a simple denial, in good faith, without prejudice, the complaint is deemed sufficient for purposes of Rule 12(e).'" Sun Co. v. Badger Design & Contractors, 939 F. Supp. 365, 374 (E.D. Pa. 1996) (quoting Wood & Locker, Inc. v. Doran and Assocs., 708 F. Supp. 684, 689 (W.D. Pa. 1989)). "[A]ll that is required under the Federal Rules of Civil Procedure [to state a sufficiently definite complaint is] . . . notice of [Plaintiff's] claims and the factual bases on which they rest." Bonds v. GMS Mine Repair & Maint., Inc., No. 13-1217, 2014 WL 66413, at *5 (W.D. Pa. Jan. 8, 2014); see also Perez v. Bardo, No. 11-376, 2011 WL 941380, at *3 (E.D. Pa. Mar. 17, 2011) ("A lack of specificity is to be expected prior to discovery.")

U.S. Steel did not hurdle the high bar for this Court to grant its Rule 12(e) motion. In Count I, Allied accused U.S. Steel of breaching Section 3 of the 2010 DSA. (Docket No. 1 ¶¶ 14–15.) Allied averred U.S. Steel did not allow it to exercise its "last look" rights to match the most acceptable bid U.S. Steel received on dismantling work for nineteen projects. (Id. ¶¶ 15–16.) Each project's general description and location is listed, with the month and year (sometimes even the day) provided for sixteen of nineteen jobs. (Id. ¶ 16.) U.S. Steel breached the 2010 DSA, according to Allied, by:

> denying Allied the opportunity to perform the above work; failing to supply Allied with the terms of the most acceptable bids; improperly combining projects; canceling purchase orders after the work was awarded to Allied; attempting to force Allied to perform the projects on terms inconsistent with the 2010 DSA and/or the terms of the most acceptable bids; attempting to force Allied to perform "last look" projects for no compensation; and improperly negotiating with bidders or soliciting modified proposals from bidders which were inconsistent with the invitation to bid.

17

(Id. ¶ 17.) Allied also alleged U.S. Steel breached the 2010 DSA by not awarding it other dismantling jobs beyond the nineteen it mentioned, resulting in additional damages. (Id. ¶ 18.) Allied "performed all conditions precedent" necessary to bring this suit and its damages exceed $75,000. (Id. ¶¶ 19–20.)

Allied's Count I allegations against U.S. Steel are intelligible. Allied informed U.S. Steel that it breached Section 3 of the 2010 DSA, listed nineteen projects affected by the breach, described how U.S. Steel breached the contract, and claimed that damages resulted. (Id. ¶¶ 14–20.) U.S. Steel can adequately answer Allied's averments in Count I. U.S. Steel's Rule 12(e) motion for a more definite statement (Docket No. 40) should be denied.

### E. Conclusion

It is respectfully recommended that U.S. Steel's Rule 12(b)(6) motion to dismiss (Docket No. 40) should be granted with prejudice as to Count III ¶ 34(6), the weather-delay aspect of Count III ¶ 34(13–14), and Count V ¶ 58(1–5) and denied as to Count III ¶ 34(1–5, 7–10, 12–14) (including all non-weather-delay aspects of ¶ 34(13–14)). Remaining for discovery are the claims in Counts I, II, III ¶ 34(1–5, 7–14), IV, and V ¶¶ 61–64 (wrongful lockout). It is also respectfully recommended that U.S. Steel's Rule 12(e) motion for a more definite statement (Docket No. 40) of Count I be denied.

Pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(D)(2) of the Local Rules pertaining to Magistrate Judges, the parties may file written objections to this Report and Recommendation within fourteen days of its service. Failure to do so will waive the right to appeal. Brightwell v. Lehman, 637 F.3d 187, 193 n.7 (3d Cir. 2011). Any party opposing written objections shall have fourteen days after the service of such objections to respond thereto.

Dated: September 14, 2017                                    /s/ Robert C. Mitchell
                                                             ROBERT C. MITCHELL
                                                             United States Magistrate Judge

cc:     All Counsel of Record