IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALLIED ERECTING AND DISMANTLING CO., Inc., | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Civil Action No. 16-1379 ) |
| UNITED STATES STEEL CORPORATION, | ) ) ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Defendant United States Steel Corporation ("U.S. Steel") has moved to exclude the testimony and opinions of Thomas Anness ("Anness"), an expert accountant retained by Plaintiff Allied Erecting and Dismantling ("Allied") to calculate its claimed damages. (ECF No. 134.) U.S. Steel contends that the opinions expressed by Anness fail to meet the standards for expert testimony under Federal Rule of Evidence 702, as well as *Daubert v. Merrell Dow Pharmaceuticals*, Inc., 509 U.S. 579 (1993) and its progeny.

U.S. Steel's motion is fully briefed (ECF Nos. 135, 141, 142, 143), and the Court has heard oral argument. (ECF No. 146 ("Daubert Tr.").) Accordingly, the matter is ripe for disposition.

For the reasons discussed below, U.S. Steel's motion will be denied.

**I.   RELEVANT BACKGROUND**

Allied, an industrial dismantling contractor, performed work for U.S. Steel at numerous locations over the years, during which time they entered into multiple agreements. In this action, Allied alleges that U.S. Steel breached its contractual obligations with respect to various dismantling projects. (ECF No. 1 ("Compl.").)

Allied's basic compensation on these projects had two components. (Daubert Tr. at 12, 29.) Because Allied had the right to keep the scrap generated on each project, one component of its compensation was the profit it could earn by selling that scrap. (*Id.* at 12–13, 29; ECF No. 135-3 (2010 Dismantling Service Agreement ("2010 DSA") § 3(H)(iv)).) On projects where the value of the scrap was not enough to cover Allied's dismantling costs, its compensation consisted of its dismantling costs minus any revenue it generated from sales of the scrap. (Daubert Tr. at 13.)

Anness is a certified public accountant who has been involved with Allied's financial matters for over forty years. As indicated in his expert report, he calculated Allied's alleged damages for the claims asserted in Counts I, II, and V. (ECF No. 135-4 ("Anness Report").)

In Count I, Allied alleges that U.S. Steel violated its "last look" rights on various dismantling projects. (Compl. ¶ 16.) Under the parties' agreement, Allied was required to provide U.S. Steel with a "project cost estimate" which set forth its costs to perform any dismantling work. (2010 DSA § 3(B).) The parties would then negotiate to attempt to reach mutually agreeable terms. (*Id.*) If an agreement was reached, Allied would perform work on a "negotiated" basis ("Negotiated Projects"). (*Id.* §§ 3(B), 3(C).) Allied performed all Negotiated Projects on a "target gross margin basis," under an agreed formula and profit margins. (*Id.* § 3(H)(i) & (ii).)

If the parties were unable to negotiate the terms, however, U.S. Steel could competitively bid the work and invite Allied to participate in the bidding. (*Id.* § 3(E).) After the work was competitively bid, Allied had "last look" rights that allowed it to match the terms of the "most acceptable bid" and perform the work. (*Id.*)

Anness based Allied's Count I damages on the lost profits associated with the projects that Allied claims to have been denied in violation of its "last look" rights. (Anness Report at 3.) He began by calculating the revenue Allied would have earned had it performed those projects. (*Id.*)

2

This calculation involved two components: (1) the contract price as reflected in the most acceptable bids for those projects; and (2) the scrap generated on each project. (*Id.*) For the second component, Anness used the actual scrap weights obtained from U.S. Steel. (*Id.*) If no weight records were provided by U.S. Steel, Anness used Allied's estimates. (*Id.*) To confirm their reasonableness, Anness compared Allied's estimates for those projects where actual scrap weights were available and found that the estimates were consistently lower. (*Id.*)

Anness calculated the scrap value based on the American Metal Markets' pricing for the first week of the month in which the "scrap" was generated. (*Id.*) He then subtracted a processing fee of $55/ton for ferrous scrap and $0.3967/pound for non-ferrous scrap. (*Id.* at Exh. A.2.) After determining the revenue, Anness calculated Allied's lost profits by applying the average profit percentage, 32.70%, from eight projects in which Allied had completed a "last look" basis under the 2010 DSA. (*Id.* at 3.) To assess the reasonableness of this profit margin, Anness compared it to the average profit Allied earned on one hundred and one Negotiated Projects completed under the 2010 DSA. (*Id.*) Because that figure was 55.33%, Anness determined that the profit margin he used was conservative. (*Id.*)

Count II of the Complaint arises out of the parties' stipulation and judgment in favor of Allied in a previous case ("2012 Litigation"). (Compl. ¶¶ 22–24, 25, 26.) In this claim, Allied seeks to recover damages associated with certain "barge and railcar" projects which were not quantified in the 2012 Litigation. (*Id.* ¶¶ 27–29.) Because of the amount of steel in barges and railcars, the scrap revenue generated from these projects generally exceeded the dismantling costs. (Daubert Tr. at 20.) Anness calculated Allied's Count II damages with respect to lost scrap revenue by using a methodology similar to that which Allied used in the 2012 Litigation. (Anness Report

at 5.) Allied's lost profits were calculated by subtracting its avoided costs from the scrap revenue that it would have generated if it had performed these projects. (*Id.*)

Anness determined the barge and railcar weights from U.S. Steel documents or, if actual figures were unavailable, from Allied's estimates. (*Id.*) He then calculated the scrap revenue based on the American Metal Markets' pricing and subtracted Allied's avoided costs from the scrap revenue. (*Id.*) Allied's avoided costs were the contract amount paid by the party which was awarded the work and a processing fee. (*Id.*) Anness used a $75/ton processing fee based on Allied's actual costs to dismantle railcars at U.S. Steel's Gary Works plant. (*Id.*) This was the same amount that Allied used in the 2012 Litigation. (*Id.*) For projects where non-union labor was permitted, Anness used a processing fee of $56.25/ton. (*Id.*)

Finally, Count V is premised on Allied's claim that it was locked out of a work site by U.S. Steel prior to the completion of all of its work. (Compl. ¶¶ 61, 64, 66.) Anness calculated Allied's Count V damages based on the value of the scrap left at that site. (Anness Report at 5.) He used Allied's weight estimates for the scrap and determined its value based on the actual average scrap price that U.S. Steel paid to Allied throughout that project. (*Id.* at 5–6.) Where applicable, Anness subtracted Allied's avoided costs which were either a processing & loading fee of $55/ton, or only a loading fee of $5/ton. (*Id.* at Exh. E.1.)

## II. LEGAL STANDARD

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) that testimony is based on sufficient facts or data;

4

>> (c) the testimony is the product of reliable principles and methods; and
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"The inquiry envisioned by Rule 702 is . . . a flexible one . . . [directed at] the scientific validity—and thus the evidentiary relevance and reliability—of . . . the proposed submission." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 594–95 (1993). The Third Circuit has explained that under *Daubert*, "district courts perform a gatekeeping function to ensure that expert testimony meets the requirements of Federal Rule of Evidence 702." *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 80 (3d Cir. 2017).

"As gatekeeper, a trial judge has three duties: (1) confirm the witness is a qualified expert; (2) check the proposed testimony is reliable and relates to matters requiring scientific, technical, or specialized knowledge; and (3) ensure the expert's testimony is 'sufficiently tied to the facts of the case,' so that it 'fits' the dispute and will assist the trier of fact." *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020) (quoting *Daubert*, 509 U.S. at 591).

"[T]he evidentiary requirement of reliability is lower than the merits standard of correctness." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) To be reliable, an expert's testimony must be "based on the methods and procedures of science, not on subjective belief and unsupported speculation." *UGI Sunbury*, 949 F.3d at 833–34 (quoting *Karlo*, 849 F.3d at 80–81). An expert's testimony need not have "the best foundation" or be "supported by the best methodology or unassailable research." *Id.* at 834 (quoting *Karlo*, 849 F.3d at 81). Instead, admissibility of an expert's opinions turns on "whether the expert's testimony is supported by good grounds." *Id*. (quoting *Karlo*, 849 F.3d at 81); *see In re Paoli R.R. Yard PCB Lit.*, 35 F.3d 717, 746 (3d Cir. 1994) ("[T]he issue is whether the evidence should be excluded because the flaw is

5

large enough that the expert lacks good grounds for his or her conclusions."). In undertaking this inquiry, "[e]ach aspect of the expert's opinion 'must be evaluated practically and flexibly without bright-line exclusionary (or inclusionary) rules.'" *Karlo*, 849 F.3d at 81 (quoting *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir. 2012)).

The "fit" requirement "goes primarily to relevance." *Id.* (quoting *Daubert*, 509 U.S. at 591). While "higher than bare relevance," the standard for assessing the "fit" of an expert's testimony "is not that high." *In re Paoli*, 35 F.3d at 745. "'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *UGI Sunbury*, 949 F.3d at 835 (quoting *Daubert*, 509 U.S. at 591). Thus, the inquiry in assessing "fit" is "whether an expert's testimony . . . 'will help the trier of fact to understand the evidence or to determine a fact in issue.'" *Id.* (quoting Fed. R. Evid. 702(a)).

U.S. Steel does not challenge the qualifications of Anness or that his opinions relate to matters requiring specialized knowledge. Rather, it asserts that his proposed testimony is unreliable because it is not based on good grounds, employs a flawed methodology and does not fit the facts of this case. U.S. Steel's challenges will be addressed below.

**III.    DISCUSSION**

A. Independent Verification

The Court begins its analysis with U.S. Steel's primary assertion that Anness's testimony does not rest on "good grounds" because he failed to independently verify Allied's data. (ECF No. 135 at 5, 11.) For example, with respect to Allied's claimed damages in Count I, U.S. Steel criticizes Anness's "blindly adherence" to the historical profit margin of 32.70% without reviewing or undertaking a comparability analysis of the "last look" projects. (*Id.* at 5, 9; Daubert

Tr. at 6–7.) Similarly, U.S. Steel contends that Anness failed to independently verify Allied's processing costs in calculating its Count II damages. (ECF No. 135 at 11.)

Allied counters that damage experts routinely incorporate factual assumptions and opinions of others into their calculations. (ECF No. 141 at 6–7, citing *LePage's Inc. v. 3M*, 324 F.3d 141, 165 (3d. Cir. 2003) ("[A]n expert may construct a reasonable offense-free world as a yardstick for measuring what, hypothetically, would have happened 'but for' the defendant's unlawful activities"); *Brill v. Marandola*, 540 F. Supp. 2d 563, 568 (E.D. Pa. 2008) ("Federal courts applying the standards established by Rule 702 and 703 have permitted damages experts to make the assumptions of fact necessary to render a sound opinion, so long as such assumptions have a reasonable basis in the available record and are disclosed to the finder of fact.").) Additionally, Allied disputes U.S. Steel's assertion that Anness did not review or undertake a comparability analysis in calculating the historical profit margin for Count I damages. (*Id.* at 1213; *see id.* at 13 n.8 ("Anness testified to the discussions with management, the nature of the comparability analysis, the back-up documents for the analysis and the reasonableness of the same.").) For Count II damages, Allied points out that Anness used the processing fees from the 2012 Litigation and Anness and his team provided much of the back-up documentation used to generate the expert report in that case. (*Id.* at 21; Daubert Tr. at 45–46.)

The Third Circuit has explained that "[i]n some circumstances, an expert might be able to rely on the estimates of others in constructing a hypothetical reality, but to do so, the expert must explain why he relied on such estimates and must demonstrate why he believed the estimates were reliable." *ZF Meritor*, 696 F.3d at 292. In this case, it appears that Anness took steps to assure himself of the reasonableness of Allied's data. As reflected in his report, Anness undertook significant due diligence in formulating his underlying assumptions. (Anness Report at 2.) This

7

included reviewing Allied's business records and interviewing its employees. (*Id.*) Additionally, as Allied points out, Anness is intimately familiar with Allied's business, having been directly involved with its financial matters as their certified public accountant for over forty years. (ECF No. 141 at 9; Daubert Tr. at 29–31.) Therefore, it cannot be said that Anness "'lack[ed] . . . familiarity with the methods and reasons underlying [Allied's data.]'" *ZF Meritor*, 696 F.3d at 293 (quoting *TK–7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993)).

In sum, U.S. Steel's argument that Anness's reliance on Allied's data without independent verification warrants exclusion of his expert testimony is unavailing. However, his reliance may be challenged through vigorous cross-examination at trial.

### B. Project Cost Estimates

U.S. Steel asserts that Anness improperly used the project cost estimates (1) to support the reasonableness of the 32.70% historical profit margin by using "projected revenues;" and (2) to determine scrap weight for the Count I projects. (ECF No. 135 at 7.) U.S. Steel argues that Anness's failure to use or consider Allied's project cost estimates in assessing the reasonableness of the 32.70% profit margin for the Count I projects makes his opinions unreliable. (*Id.* at 5.) U.S. Steel correctly points out that Allied's project cost estimates reflect that it could not have profitably performed any of those projects. (*Id.* at 6.) While U.S. Steel acknowledges Anness's testimony that project cost estimates were calculated as a "worst case approach" (*id.* at 7), it maintains that Anness did, in fact, use those estimates when it inured to Allied's benefit to do so. (*Id.*) That, according to U.S. Steel, makes Anness's testimony unreliable.

The Court notes that whether Allied's project cost estimates were calculated as a "worst case approach" is a disputed fact. (ECF No. 141 at 16–17; Daubert Tr. at 5; 10, 37–38.) At this point, therefore, Anness may rely on that factual assumption and U.S. Steel may challenge his

reliance at trial. As for Anness's use of the project cost estimates to determine scrap weights, Anness's report reflects, and Allied's counsel confirmed at oral argument, that he used Allied's scrap estimates when the actual scrap data was unavailable. (Anness Report at 3 & Exh. A.2; Daubert Tr. at 36.) Anness also compared Allied's scrap estimates for those projects where actual scrap weights were available and found that, historically, Allied's scrap estimates were more conservative and as such, concluded that they were a reliable measure to use. (Anness Report at 3.)

Finally, U.S. Steel's assertion that Anness used Allied's project cost estimates to support the reasonableness of the 32.70% historical profit margin is misplaced. Contrary to U.S. Steel's suggestion, Anness did not use "revenue projections" to calculate the 55.33% profit margin that Allied earned on one hundred and one Negotiated Projects. (Anness Report at 3 & Exh. C.) Anness explains in his report that in making that calculation, he did not adjust the total allowable revenue to "the agreed contract margins because that actual gross profit was more relevant" to the analysis. (Anness Report at 4.) That appears to be reasonable because while the Negotiated Projects were performed on a "target gross basis" (2010 DSA § 3(H)(i) & (ii)), those profit margins did not apply to the "last look" projects.

Based on the above, the Court rejects U.S. Steel's argument that Anness's failure to consider Allied project cost estimates in assessing the reasonableness of the 32.70% profit margin while using those estimates to determine scrap weights for some of the Count I projects makes his testimony unreliable.

C.  Other "Reliability" challenges to Anness's Testimony

U.S. Steel advances several other challenges to Anness's expert opinions. However, these challenges go to the weight of Anness's opinions, not their admissibility, and therefore are issues that can and should be addressed at trial. A brief review of these challenges follows.

1. Count I

U.S. Steel argues that in calculating the historical profit margin of the "last look" projects for determining damages in connection with Count I, Anness should have used a weighted average of eight completed "last look" projects rather than a composite average. (ECF No. 135 at 5.) Allied counters that while U.S. Steel may prefer one approach over the other, it cites no authority that would require it. (ECF No. 141 at 14 n.11.) U.S. also contends that because the market value of ferrous scrap fluctuates over time, Anness should have used the market value of ferrous scrap "when Allied would have actually processed and sold the scrap." (ECF No. 135 at 9–10.) In response, Allied argues that U.S. Steel does not explain why using the first week in which the scrap would have been generated makes Anness's testimony unreliable. (ECF No. 141 at 19.)

U.S. Steel also questions Anness's application of $55/ton processing for ferrous scrap and the $0.3967/pound fee to process non-ferrous scrap. (ECF No. 135 at 10.) In response, Allied notes Anness's testimony that reflects that the $55/ton flat fee was agreed to by the parties (ECF No. 141 at 20.) Allied also points out that Anness testified that the $0.3967/pound fee was based on actual business records. (*Id.*)

2. Count II

U.S. Steel criticizes Anness for reducing Allied's avoided costs by $130,000 based on what he perceived to be a sale of trucks back to U.S. Steel. (ECF No. 135 at 12.) According to U.S. Steel this error is a methodological flaw that renders Anness's testimony unreliable. (*Id.*) Allied counters

10

that whether these trucks were ever sold back to U.S Steel is a factual dispute, and Anness may assume the facts as relayed to him by Allied. (ECF No. 141 at 22.)

U.S Steel also contends that Anness should have applied project specific cost adjustments and should have considered specific challenges posed by particular projects, including the dismantling of barges in Mobile, Alabama. (ECF No. 135 at 12–13.) In response, Allied argues that there is no factual basis to differentiate between railcar dismantling projects because these projects are similar in size, and the cost to dismantle one railcar correlates strongly with the cost to dismantle another. (ECF No. 141 at 22.) With respect to the barge project in Mobile, Alabama, Allied points out that the final lost profit calculation for that project was only $6,000. (*Id.*) According to Allied, even if U.S. Steel's criticisms were valid, they would only have a *de minimis* effect on Anness's total lost profit calculation. (*Id.*)

      3.  Count V

For Count V damages, U.S. Steel criticizes Anness for relying on Allied's estimated scrap weights when actual contemporaneous scrap weight evidence existed, and for erroneously calculating the scrap from a building that Allied never dismantled. (ECF No. 135 at 13–14.) U.S. Steel raised the same argument in its motion for partial summary judgment and, in rejecting it, the Court explained that "while U.S. Steel may challenge [Anness's] opinions and the basis for them, such arguments properly go to the weight of Allied's evidence and the credibility of its expert." (ECF No. 121 at 29.) U.S. Steel has furnished no compelling reason for the Court to revisit its prior ruling.

      D.  <u>Anness's Testimony "Fits" the Dispute</u>

U.S. Steel also seeks to exclude Anness's testimony for failure to fit the issues in the case. (ECF No. 135 at 15.) In this regard, U.S. Steel simply argues Anness's testimony is so erroneous

and unreliable that a jury would be hard-pressed to decipher any meaningful information from it. (*Id.*). In fact, while Anness's opinions may include mistakes or flaws that can be explored at trial and may impact his credibility or the weight to be given to his testimony, they fit the proceedings. He has calculated Allied's damages by using a lost profits methodology. Because quantifying such damages are beyond the expertise of an average layperson, Anness's testimony would undoubtedly assist the trier of fact.

### IV. CONCLUSION

For these reasons, U.S. Steel's motion to exclude at trial the testimony and opinions of Thomas Anness will be denied. An appropriate order will follow.

BY THE COURT:

/s/ Patricia L. Dodge
Patricia L. Dodge
United States Magistrate Judge

Dated: August 12, 2020