# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ALLIED CONSOLIDATED INDUSTRIES,  )
INC., for and on behalf of ALLIED  )
ERECTING AND DISMANTLING CO.,  )
INC.,  )
      )   Civil Action 2:16-1379-PLD
      )
    Plaintiff,  )
      )
  vs.  )
      )
UNITED STATES STEEL  )
CORPORATION,  )
      )
    Defendant.  )

## MEMORANDUM OPINION

Allied Erecting and Dismantling Co., Inc. ("Allied")[1] has asserted breach of contract claims against Defendant United States Steel Corporation ("U.S. Steel").

Based upon consideration of the testimony and evidence presented at trial, the parties' submissions, and on the following findings of fact and conclusions of law, the Court finds in favor of Allied with respect to certain of its claims, and in favor of U.S. Steel with respect to Allied's remaining claims.

### I.   Relevant Procedural History

Allied commenced this action in September 2016 by filing a five-count breach of contract action against U.S. Steel arising out of their contractual relationship. U.S. Steel's motion to transfer venue was granted by District Judge David Cercone, who was then presiding over this

---

[1] A Motion to Substitute Plaintiff and Modify Caption (ECF No. 205) was granted on June 8, 2021. The substituted plaintiff is "Allied Consolidated Industries, Inc., for and on behalf of Allied Erecting and Dismantling Co., Inc." and the caption has been modified accordingly. Throughout this opinion, however, Allied Erecting and Dismantling Co. will be referred to as "Allied." As necessary, the substituted plaintiff will be referred to as "Allied Consolidated."

case, and Allied's lawsuit was transferred to the United States District Court for the Northern District of Ohio in December 2016. In July 2017, however, this case was transferred back to the Western District of Pennsylvania with Judge Cercone presiding and Magistrate Judge Robert Mitchell referred.

U.S. Steel then moved for the partial dismissal of Allied's claims in Counts III and V of the Complaint, as well as for a more definite statement of Count I. In a Report and Recommendation issued on September 14, 2017 (ECF No. 66), Magistrate Judge Mitchell recommended that U.S. Steel's 12(b)(6) motion be granted as to the dismissal of Paragraph 34(6) of Count III; the weather-delay aspect of Count III (Paragraph 34 (13-14)); and Paragraph 58 (1-5) of Count V. He further recommended that U.S. Steel's motion to dismiss Count III, Paragraph 34 (1-5, 7-10, 12-14) (including all non-weather delay aspects of Count III), Paragraph 34 (13-14)) of Count III and the request for a more definite statement be denied. Subsequently, over the parties' respective objections, Judge Cercone adopted the Report and Recommendation as the opinion of the Court (ECF No. 73).

After the parties engaged in discovery, U.S. Steel moved for partial summary judgment on Counts I, III, IV, and V of the Complaint. Judge Cercone granted U.S. Steel's motion only with respect to the claims asserted in Count I, Paragraph 16 (1, 2, 5, 6, 11), and denied all other relief sought by U.S. Steel. U.S. Steel's subsequent motion for reconsideration was denied by Judge Cercone (ECF No. 131).

Upon Magistrate Mitchell's retirement in June 2019, this case was reassigned to the undersigned. On March 6, 2020, the parties voluntarily consented to have a United States Magistrate Judge conduct all further proceedings in the case, including trial and entry of a final

judgment, with direct review by the United States Court of Appeals for the Third Circuit if any appeals are filed.

Prior to trial, U.S. Steel filed a Motion to Exclude Purported Expert Testimony and Opinions of Thomas Anness. After its motion was fully briefed and oral argument was held, its motion was denied (ECF No. 151).

A thirteen-day bench trial was held between November 2, 2020 and November 20, 2020. After the transcript was prepared, the parties submitted Proposed Findings of Fact and Conclusions of Law, as well as post-trial memoranda. The parties presented post-trial closing arguments on April 26, 2021.

## II. Legal Standard

In this breach of contract action, the Court sits as the trier of fact tasked with resolving factual disputes, weighing the credibility of the evidence, and deciding the disputed legal issues between the parties. *See FTC v. Innovative Designs, Inc.*, Civ. Act. No. 16-1669, 2020 WL 758727, at *1 n.2 (W.D. Pa. Feb. 14, 2020); *EBC, Inc. v. Clark Bldg. Sys., Inc.*, Civ. Act. No. 05-1549, 2008 WL 4922107, at *4 (W.D. Pa. Nov. 13, 2008), *aff'd*, 618 F.3d 253 (3d Cir. 2010). The Court is also required to assess the credibility of witnesses. *EBC, Inc.*, 2008 WL 4922107, at *4. The Court's credibility determinations are entitled to significant deference. *See VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, 282-83 (3d Cir. 2014) (citing *Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am.*, 609 F.3d 143, 156-57 (3d Cir. 2010)); *Booker v. United States*, 789 F. App'x 304, 306 (3d Cir. 2019) (due regard must be given to the "trial court's judgments as to the credibility of the witnesses").

Based upon these standards, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 52.

## III.     Findings of Fact

### A.   The Parties and Their Relationship

At all relevant times, Allied was an industrial dismantling contractor based in Youngstown, Ohio with extensive experience performing dismantling work at steel mills, including at various mills for U.S. Steel.  (Trial Transcript ("Tr.") 11/2/20 at 82-85.)  Allied performed over 600 dismantling projects for U.S. Steel during their relationship, which began in 1980.  (*Id.* 87-88; Exhibit ("Ex.") 25.)

Both Messrs. John Ramun and Gordon Lindquist testified at trial on behalf of Allied and this Court finds both to be credible witnesses.  Mr. Ramun has been the President of Allied since 1973.  Mr. Lindquist, its former general superintendent, worked for Allied for forty-two years until his retirement in 2016.  He reported directly to Mr. Ramun.  (Tr. 11/10/20 at 137.)  In turn, Allied's project superintendents reported to Mr. Lindquist.  (*Id.*)  Mr. Lindquist was involved in all dismantling projects that Allied performed for U.S. Steel.  (Tr. 11/2/20 at 10-12, 90.)  He prepared the work plans and initial proposals for all U.S. Steel demolition jobs, including those for which U.S. Steel decided to competitively bid demolition work.  (*Id.* at 17-18.)  As part of his responsibilities, he was in charge of running projects and tracking progress.  (Tr. 11/10/20 at 163-164.)  This required extensive travel to project sites and sometimes he could only get to individual sites about once a week.  (Tr. 11/10/20 at 140-141.)  He reviewed daily reports of the activities on individual projects.  (Tr. 11/10/20 at 141-142.)

In 2004, Mr. Lindquist also became the chief estimator for Allied's demolition projects and served in that role until his retirement.  (*Id.* at 19-21.)  As part of those duties, beyond his initial scrap estimates for the projects, he also prepared scrap estimates for the monthly scrap offerings to U.S. Steel.  (*Id.*)

4

Mr. Ramun's duties included calculating cost estimates and proposals for U.S. Steel projects after Mr. Lindquist completed his work. (Tr. 11/2/20 at 128-130.)

Gary Cornelius is a U.S. Steel employee who, starting in 2008, was the liaison with Allied on various projects. (Tr. 11/9/20 at 64.) He interacted with Mr. Lindquist, among other Allied employees, on projects and would be notified of the ongoing work and would advise what work should be done. (*Id.*) After Mr. Cornelius retired, he was replaced by Joseph Manga. (*Id.* at 65.) Paul Falkenhan was a purchasing manager for U.S. Steel whose duties included purchasing, implementing the last look process and running last-look project job meetings. (Tr. 11/9/20 at 64; Tr. 11/13/20 at 113-114.) Robert Wilmunen was a U.S. Steel engineering manager who oversaw Minntac, one of the projects in dispute. (Tr. 11/17/20 at 4, 13.) William Lamb, a project manager at U.S. Steel, oversaw Allied's dismantling activities at Fairless, another project at issue. (Tr. 11/19/20 at 5.) All of these U.S. Steel employees testified at trial other than Mr. Cornelius.

During the course of their relationship, Allied and U.S. Steel entered into multiple agreements regarding Allied's work or potential work for U.S. Steel on various dismantling projects. As relevant here, these contracts included the Final Conformed Specification ("FCS") (Ex. 2), the 2003 Blanket Agreement (Ex. 4), the 2003 Agreement in Principle ("2003 AIP") (Ex. 3), the 2004 Agreement in Principle ("2004 AIP") (Ex. 5), and the 2010 Dismantling Services Agreement ("2010 DSA") (Ex. G).

The parties' relationship was contentious at various points in time. In 1993, they were involved in a lawsuit that related to a number of disputes at various U.S. Steel project sites. (Tr. 11/2/20 at 107.) The parties settled this lawsuit, as a result of which they entered into the 2003 AIP. (*Id.*; Ex. 3.)

In 2012, Allied commenced a lawsuit against U.S. Steel in the United States District Court for the Northern District of Ohio at docket number 4:12-cv-01390 (the "2012 Litigation") in which it alleged that U.S. Steel breached the 2003 AIP, the 2004 AIP, and the 2010 DSA. (Trial Tr. 11/2/20 at 107; Tr. 11/4/20 at 92:7-15.) U.S. Steel asserted several counterclaims against Allied in that lawsuit. Following partial summary judgment in favor of U.S. Steel on its counterclaim, and a jury award in favor of Allied, the Court entered an amended judgment in favor of U.S. Steel for $10.6 million (2012 Litigation, ECF No.369.)

The parties' relationship continued thereafter to be troubled, culminating in the present lawsuit. They no longer have a business relationship.

In April 2016, Allied filed for bankruptcy protection. Allied commenced this lawsuit several months later. (Tr. 11/4/20 at 95:25-96:6.)[2]

B. Overview of the Parties' Contracts[3]

The FCS (Ex. 2) and the 2003 AIP (Ex. 3) governed Allied's dismantling work at U.S. Steel's Fairless Works ("Fairless") facility. The 2003 AIP, which was executed in November 2003, provided Allied, among other things, with "last look" rights on all of U.S. Steel's dismantling work, as well as the right to all future dismantling work to be performed at Fairless, regardless of time. (Ex. 3.) It also provided an advance to Allied of $7 million. (*Id.*) Pursuant to the terms of the 2004 AIP, U.S. Steel promised to pay Allied an advance of $10 million for dismantling work, which Allied could invoice over the next sixty months. (Ex. 5 § II(A)(1).) The 2004 AIP granted Allied, inter alia, the right to all of U.S. Steel's dismantling work for a 10-year period, again on a "last look" basis. (Ex. 5.)

---

[2] All of the claims in this case were contemporaneously raised with U.S Steel between 2012 and 2015.
[3] Relevant provisions of these contracts will be discussed in more detail as necessary in connection with each of Allied's claims.

The 2010 DSA incorporates the 2003 Blanket Agreement. (Ex. 7 § 4(A).) As provided in the 2010 DSA, the 2003 Blanket Agreement (Ex. 4), which covered work performed by Allied for U.S. Steel effective November 18, 2003 through March 31, 2014, applies to any work performed under the 2010 DSA except with respect to Fairless. (Ex. 7 § 4(A); Tr. 11/4/20 at 82:18-22; 85:11-14.) The 2010 DSA extended Allied's right to perform all of U.S. Steel's dismantling work across the country until December 31, 2015, on either a "negotiated" or a "last look" basis. (Ex. 7 §§ 1, 3; Tr. 11/2/20 at 112.) While U.S. Steel was not obligated to perform any dismantling work during the term of the 2010 DSA, if it did so, any such work was required to be offered to Allied, which was designated the "primary dismantling contractor." (Ex. 7 § 3(A).)

As structured in the 2010 DSA, Allied would provide U.S. Steel with an initial Project Cost Estimate in order to facilitate a negotiated agreement between Allied and U.S. Steel on each project. (*Id.* § 3(B).) The "negotiated" format had specific contours about how Allied would be compensated for its work. (Tr. 11/2/20 at 115-21; Ex. 7 § 3(I).) Allied's "Project Cost Worksheet" itemized its anticipated costs and revenues. Allied was required to follow a "Target Gross Margin Basis," which includes a 30% profit margin through September 30, 2012, and a 25% profit margin thereafter. (Ex. 7 §§ 3(B), (H)(i-iii); Tr. 11/2/20 at 116:2-7; Tr. 11/4/20 at 75:15-21.)

In the event that Allied rejected a project or the parties were unable to negotiate acceptable terms, U.S. Steel had the right at its sole election to cancel or postpone the project or competitively bid the work. In the event that U.S. Steel competitively bid the project, it was required to invite Allied to participate in the bidding. (Ex. 7 § 3(E).) U.S. Steel could select from the submitted competitive bids the "most acceptable bid," which U.S. Steel could determine in its sole and good faith discretion. (Ex. 7 § 3(E); Tr. 11/4/20 at 76:25-77:3.) The most acceptable bid was not required to be the lowest bid. (Tr. 11/2/20 at 124:16-20.)

Pursuant to Section 3(E) of the 2010 DSA, U.S. Steel was required to supply Allied with the "most acceptable bid." Allied then had "last look" rights to determine whether it would "match the terms of the most acceptable bid" that had been selected by U.S. Steel and "agree to perform the work on such terms." (Ex. 7 § 3(E).) So-called "last look" projects were lump sum projects. (Tr. 11/10/20 at 161.) The 2010 DSA does not define the "terms" of the most acceptable bid or address whether U.S. Steel could cancel the project without compensating Allied after Allied matched the terms of the most acceptable bid and agree to perform the work on those terms. (*Id.*)

The 2010 DSA provides that "All change orders must be agreed upon on any project prior to the commencement of work required by reason of the change order." (Ex. G § 3(C).) Further, Article 10 of the 2003 Blanket Agreement states: "Before proceeding with any work involving possible claims by [Allied] for extra compensation above the contract price for work, [Allied] shall submit in writing to [U.S. Steel], a detailed estimate of the price for such work and shall secure from [U.S. Steel's] purchasing agent, a written order describing such work and fixing [Allied's] compensation." (Ex. 4, Art. 10.2.)

As set forth in the 2010 DSA, U.S. Steel was permitted to terminate Allied from projects if Allied failed to supply proper labor, equipment, or in any respect failed to perform its obligations. (Ex. 7 § 9.1.)

The parties also agreed in the 2010 DSA that "[n]o…course of performance… purporting to modify, vary, supplement or explain any provision of this Agreement shall be effective unless in a writing prepared for such purpose" and signed by representatives of both parties. (Ex. 7, § 4(F)).

C. The Parties' Experts

Both parties presented expert testimony at trial regarding damages. Allied's expert, Thomas Anness, was Allied's outside accountant for approximately fifty years. (Tr. 11/16/20 at 7.) Mr. Anness provided expert testimony and opinions regarding Allied's claimed damages. James Falconi testified on behalf of U.S. Steel and provided rebuttal testimony to Mr. Anness's assessment of damages with respect to Counts I, II and V. Their testimony and opinions will be discussed herein as relevant to the determination of Allied's damage claims.

With this brief background, the Court now turns to each of Allied's claims.

D. Last Look Projects (Count I)

Allied performed forty-five last look projects for U.S. Steel under the 2010 DSA. (Tr. 11/5/20 at 64-65; Tr. 11/10/20 at 158.) Allied now seeks damages with respect to thirteen last look projects. Regarding these projects, Allied divides its claims into five categories: (1) U.S. Steel's failure to provide the complete most acceptable bid to Allied; (2) U.S. Steel's demand that Allied agree only to match the price and scheduled terms of the most acceptable bidder; (3) U.S. Steel's cancellation of several projects after Allied had exercised its last look rights and accepted the projects; (4) U.S. Steel's communications with the most acceptable bidder; and (5) U.S. Steel's attempt to set off amounts owed to Allied.

1. **Failure to Provide Complete Bid**

Allied has identified four projects that fall under this portion of its claim: (1) Great Lakes/Zug Island Sulfate Building (Phase 4, Part B); (2) Granite City Baghouse Platform; (3) Port Perry COG Pipeline Removal; and (4) Clairton C-3064 Flushing Liquor Surge Tank.

The 2010 DSA does not identify the specific documents that represent a "bid." It does provide, however, that Allied must advise U.S. Steel within ten days of its receipt of the "most

acceptable bid" whether it will "match the terms of the most acceptable bid and agree to perform the work on such terms." (Ex. 7 § 3(E).) [4]

The terms of U.S. Steel's standard bidding documents, that is, its standard form Request for Quotations, mandated that bids must include, among other things, a signed bid sheet, a project schedule, and a written workplan. (*See, e.g.*, Ex. 71, 72, 104.) A workplan submitted by a bidder described, among other things, how the bidder intended to accomplish the work for the price it submitted, what equipment it intended to use and any exceptions, exclusions, or conditions it placed on the proposed scope of work at its price. (Tr. 11/9/20 at 30-31.) The work plan is a narrative that includes the price, duration, crew size and equipment. (Tr. 11/2/20 at 126-127.)

Until 2014, U.S. Steel provided Allied with the most acceptable bidder's complete bid package so that Allied could decide if it elected to exercise its last look rights. Beginning in mid-2014, however, U.S. Steel no longer uniformly did so. With respect to the Great Lakes/Zug Island Sulfate Building, for example, Allied requested a copy of the most acceptable bid multiple times but U.S. Steel did not provide it. Instead, U.S. Steel only provided the price and schedule of the most acceptable bidder. (Tr. 11/5/20 at 97.) With respect to the three other projects at issue, Port Perry, Granite City and Clairton, U.S. Steel provided the bid sheet, work plan and price of the most acceptable bidder but did not provide the entire bid. (Tr. 11/5/20 at 87, 92-93, 95.) Because it did not receive the entire bid, Allied declined to exercise its last look rights with respect to each of these projects, and now seeks damages for breach of contract.

---

[4] The July 15, 2004 Dismantling Services Agreement (Ex. 6), provides that U.S. Steel shall inform Allied of the most acceptable bid by "disclosing the actual bid received by U.S. Steel." Allied is then required to state whether it will "match the terms of the most acceptable bid and agree to perform the work on such terms." (*Id.* § III(B).) Further, the Agreement requires the parties to agree on the terms of Allied's work, which terms, "at a minimum," must include "price/payment terms," "scope of work" and "schedule." (*Id.* § III(G).)

Mr. Ramun testified that by exercising its last look rights, Allied agreed to perform the work for the price and schedule of the most acceptable bidder. (Tr. 11/4/20 at 77.) Mr. Lindquist agreed that if Allied exercised its last look rights, it was not required to perform a project in the same manner that was set forth in the most acceptable bid. (Tr. 11/12/20 at 101-102.) Allied could perform the work in the way that its skills and experience would allow. (Tr. 11/4/20 at 78, 79-80.) Allied was entitled to perform last look projects via its own means and methods, but within the framework of the most acceptable bid terms. (*Id.*) Therefore, Allied took the position that it was entitled to see the entire bid as part of U.S. Steel's last look disclosure. Allied exercised its last look rights on several projects for U.S. Steel despite not being provided with all of the documents of the most acceptable bidder. (Tr. 11/5/20 at 106, 112, 114.)

Allied claims that because U.S. Steel breached the 2010 DSA by failing to provide it with complete most acceptable bid, it sustained the following lost profit damages[5]:

- Great Lakes/Zug Island Sulfate Building (Phase 4, Part B): $120,356.00

- Granite City Baghouse Platform: $13,966.00

- Port Perry COG Pipeline Removal: $77,609.00

- Clairton C-3064 Flushing Liquor Surge Tank: $19,420.00

**2. Wrongful Cancellation**

Allied has asserted claims for wrongful cancellation with respect to the Great Lakes/Zug Island Crusher Screening Building and Conveyor Junction House; the Gary #2 Boiler House COG Feed Line; the Fairfield QBOP Area Demo; and the Granite City Dust Storage Silo.

---

[5] All damage claims referenced herein do not include any calculation of interest. The methodology associated with the calculation of Allied's damages is discussed *infra.*

a. *Great Lakes/Zug Island Crusher Screening Building and Conveyor Junction House*

The Great Lakes Crusher/Screening Building and the Conveyor Junction House were initially bid as separate stand-alone projects. (Ex. H; Ex. T; Tr. 11/5/20 at 68:1-7, 70:19-24.) After U.S. Steel submitted the project to competitive bidding, a pre-bid meeting was held with various bidders, including Allied. (Ex. K at AED_000802.) The bid package sent to all bidders included certain "cut-line separation" drawings, indicating that the substation was to stay, and detailing the cuts the winning bidder would have to make in order to save the substation. (Ex. K at AED_000810-814; Tr. 11/2/20 at 167:22-168:7.)

Allied exercised its last look rights on October 10, 2012 to dismantle the Great Lakes Crusher Screening Building as a stand-alone project. (Ex. 38; Tr. 11/2/20 at 171-72.) The Project Scope Document ("PSD") for the project included "cut line" drawings showing the separation of an electric substation from the balance of the facility that was to be dismantled. (Ex. 33; Tr. 11/2/20 at 167-71.) The PSD includes photos that indicate the substation was to remain. (Ex. H at AED_000696; Tr. 11/5/20 at 70:12-18.) Allied's original proposal for this stand-alone project states that "the substation that is located on the west side and under part of the Crusher/Screening Building will remain. The substation will remain in service during the removal of the Crusher/Screening Building." (Ex. H at AED_000684; Tr. 11/5/20 at 69:15-23.)

Following Allied's acceptance and U.S. Steel's issuance of a purchase order to Allied for this project (Ex. 65), U.S. Steel cancelled it and combined the Crusher/Screening Building and Junction House into a single, combined project. (Tr. 11/5/20 at 71:16-20.) Allied objected to the cancellation because Allied had already accepted the project. (Ex. 45; Tr. 11/2/20 at 172-73.) However, it agreed to rebid the combined project but asserted that its willingness to do so was

without prejudice to its right to seek damages for U.S. Steel's wrongful cancellation of the stand-alone project. (Ex. 48; Tr. 11/2/20 at 173.)

U.S. Steel competitively bid the combined project and sent a bid package for the combined project to several dismantling contractors, including Allied. (Exs. 42, 43; Tr. 11/2/20 at 174-75.) The bid package and the PSD stated that the substation was still to remain. (Ex. U at AED_000937; AED_000950; Tr. 11/5/20 at 72:5-18.) The bidders who attended the pre-bid meeting for the combined project were the same bidders who had attended the pre-bid meeting for the cancelled stand-alone project. (Ex. X at AED_001082; Tr. 11/10/20 at 176:21-178:3.) U.S. Steel later sent a revised bid package for this project to the bidders, including Allied. (Ex. 44.)

The separation work identified in the stand-alone project and the bid package for the stand-alone project had included the "cut line" drawings. (Ex. 33). No "cut line" drawings describing separation work were included in the PSD for the combined project. (Exs. 42-44; Tr. 11/2/20 at 175; Tr. 11/9/20 at 43-45.)

Mr. Lindquist attended the pre-bid meetings for both the stand-alone and combined projects. (Tr. 11/9/20 at 43.) Mr. Lindquist did not receive any cut line drawings at the December 7, 2012 combined project pre-bid meeting. (Tr. 11/9/20 at 46-48.) He was aware that the substation on a portion of the Crusher/Screening Building would remain, knew where it was and had walked through the site. (Tr. 11/10/20 at 173, 175, 178.) Mr. Lindquist testified that the drawings of the Crusher/Screening Building and the substation did not make clear that the substation was actually underneath the building. (Tr. 11/9/20 at 45-46; Tr. 11/10/20 at 176-177.) It was important to know whether separation work was necessary as it would determine how the dismantling would have to be accomplished. (Tr. 11/9/20 at 49.)

On January 7, 2013, U.S. Steel sent Allied the most acceptable bid for this project. (Ex. 49; Tr. 11/2/20 at 174-77.) The work plan for the most acceptable bid did not include or reference the substation "separation" work. (*See* Exs. 42-44, 49.)

Allied advised U.S. Steel on January 17, 2013, that it would match the terms of the most acceptable bid for the project. (Ex. 51; Tr. 11/2/20 at 177-78.) When Allied exercised its last look rights, the scope of the work had not changed; the substation was still to remain. (Ex. AA at AED_001161; Tr. 11/5/20 at 74:7-13.) However, the subsequent purchase order issued by U.S. Steel U.S. Steel to Allied on January 29, 2013 did not reference either the "separation" work or the "cut line" drawings. (*Id.*; Tr. 11/13/20 at 158.)

Soon after Allied began work on the combined project, it requested additional compensation in order to save the substation. (Tr. 11/10/20 at 179:21-180:1.) Allied's March 11, 2013 letter to U.S. Steel stated that because the "separation" work on the substation was not required by the bid documents or work plan, performing this work would be an additional cost. (Ex. 53; Tr. 11/2/20 at 178-79.) Allied also noted that the most acceptable bid for the combined project was approximately $90,000 lower than the bid for the stand-alone project, which reflected the absence of the "separation work" in the scope of work for the combined project. (*See* Ex. 53.) Paul Falkenhan of U.S. Steel admitted that U.S. Steel "did not submit those cut line drawings" as part of the combined project but claimed that it "was a verbal term of the contract." (Tr. 11/13/20 at 156-57.)

It is undisputed that the PSD did not contain the cut-line drawings. U.S. Steel subsequently communicated with Brandenburg, the most acceptable bidder, to seek clarification that the separation work was included in its bid for the project. (Tr. 11/13/20 at 159-60.) The work plan of the most acceptable bidder did not include separation cuts. (Tr. 11/10/20 at 180.) U.S. Steel

later advised Allied of its position that "[t]he cut line separation work was included as part of the lowest competitive bid," and that if Allied was not willing to perform this work for the amount of the most acceptable bid, Allied would not be awarded the project. (Ex. 54; Tr. 11/ 3/20 at 10-12.) Allied responded by stating that the combined bid package (Exs. 42-44), did not contain the "cut line" drawings. (Ex. 58.; Tr. 11/3/20 at 12-13.) Allied further noted that these drawings were not given to the bidders at the pre-bid meeting which Allied attended, nor were they included in the most acceptable bid that U.S. Steel provided to Allied. (Ex. 58.)

Allied offered U.S. Steel three options: (1) it would perform the work per the PSD; (2) it would perform the requested extra work if U.S. Steel issued a change order acknowledging the extra work; or (3) it would perform the extra work without additional compensation, but under protest. (*See id.*; Tr. 11/3/20 at 13.) U.S. Steel then awarded the project to Brandenburg, who performed the full scope of work for the same price Allied had promised to perform the work. (Ex. 64; Tr. 11/3/20 at 17-18; Tr. 11/13/20 at 160:21-161:4.)

Allied attempted to resolve the dispute pursuant to the dispute provision in the 2010 DSA (§ 4(C)), but U.S. Steel was unwilling to meet with Allied, nor did U.S. Steel ever address Mr. Ramun's communications. (Exs. 57, 61, 62; Tr. 11/3/20 at 14-15.) Allied asserts that U.S. Steel's direction to Allied to perform the extra "separation" work without additional compensation; its refusal to issue a change order for this extra work; and its subsequent cancellation of the project were all in breach of the 2010 DSA.

As will be discussed in more detail, Allied seeks lost profit damages on this project in the amount of $276,015.00.

### b. *Gary #2 Boiler House COG Feed Line*

U.S. Steel competitively bid the Gary #2 Boiler House project after Allied submitted an initial project cost estimate. (Ex. 111-12; Tr. 11/3/20 at 18-19.) U.S. Steel sent a revised bid package to Allied and other bidders and asked Allied to agree to perform the work in accordance with the contract schedule and perform the work described. (Ex. 117 at 2; Tr. 11/3/20 at 19-20.) Allied agreed to perform the work. (Ex. BY at AED_003045; Tr. 11/5/20 at 106:8-16.) U.S. Steel did not proceed with this project due to the plant's budget and the work was never performed. (Tr. 11/5/20 at 106.) A purchase order was not issued for this project. (*Id.*)

Allied claims lost profit damages of $44,412.00 due to U.S. Steel's cancellation of the project.

### c. *Fairfield QBOP Area Demo*

With respect to Fairfield QBOP Area Demo, after Allied submitted an initial project cost estimate, U.S. Steel decided to competitively bid the project. (Ex. CA; Ex. 132; Tr. 11/3/20 at 22.) U.S. Steel later advised all bidders, including Allied, that it had decided to use plant labor to complete the project. (Ex. 131; Tr. 11/3/20 at 23.) The work was performed by plant labor. (Tr. 11/13/120 at 180.) While U.S. Steel was not obligated to award work to Allied if a collective bargaining agreement required the work to be performed by plant forces, there was no collective bargaining agreement in place that required the work to be done by U.S. Steel's plant labor. (Tr. 11/13/20 at 180.) Thus, Allied claims that it is entitled to its lost profits in the amount of $26,673.00.

### d. *Dust Storage Silo at Granite City*

Allied submitted an initial project cost estimate on December 17, 2013 to demolish the Dust Storage Silo at Granite City. (Ex. CS.) U.S. Steel decided to competitively bid this project

and sent a bid package on January 8, 2014, to several dismantling contractors, including Allied. (Ex. 151; Tr. 11/3/20 at 24-25.)  Pursuant to § 3(E) of the 2010 DSA, U.S. Steel sent Allied an email on February 6, 2014, in which it requested that Allied "respond per the contract agreement timeline." (Ex. 154; Tr. 11/3/20 at 25-26.)  On February 6, 2014, Allied requested that U.S. Steel provide Allied with a complete copy of the most acceptable bid. (Ex. 154.)  While Allied exercised its last look rights and agreed to match the terms of the most acceptable bid (Ex. CZ at AED_003460; Tr. 11/5/20 at 102:2-5), Allied also requested that U.S. Steel provide the information that it had requested on February 6, 2014. (*Id.*)

U.S. Steel informed Allied on February 17, 2014, "Granite City Operations Managers are reviewing the equipment for an alternate use.  We will notify you if they elect to demolish it." (Ex. DA at AED_003466; Tr. 11/5/20 at 102:10-16.)  The Dust Storage Silo was never dismantled. (Tr. 11/5/20 at 103:3-4.)  A purchase order was not issued for this project.

Allied claims lost profit damages on this project in the amount of $18,101.00.

### 3. Improper Negotiations

Allied claims damages with respect to two projects, the Great Lakes/Zug Island Crusher Screening Building and Conveyor Junction House[6] and the Granite City Blooming Mill Stacks.

With respect to the Blooming Mill Stacks, U.S. Steel competitively bid this project after Allied submitted an initial project cost estimate. (Ex. CG.)  After the bid close date, U.S. Steel communicated with International Chimney, who had submitted a bid on February 4, 2014, and allowed it to submit a revised bid dated February 6, 2014, which included reduced pricing based on a modified scope of work. (Ex. 141 at 2; Tr. 11/3/20 at 28-34; Tr. 11/9/20 at 38-40; Tr. 11/13/20

---

[6] Allied claims various breaches of last look rights related to this project, including improper negotiations.  The facts related to the Great Lakes/Zug Island Crusher Screening Building and Conveyor Junction House are discussed at pp. 11-15, *supra.*

at 143-44.) U.S. Steel then submitted the revised bid and its pricing to Allied as the most acceptable bid. It also included the previous February 4, 2014, bid with the price redacted. (Ex. 141 at 1.)

The last look disclosure includes two communications from International Chimney, one dated February 4, and one dated February 6. The February 6 letter states that the pricing was updated to remove the installation of a debris barrier. (Ex. CM at AED_003294-295; Tr. 11/5/20 at 80.) Before Allied received the last look opportunity, it was aware that the debris barrier that was originally contemplated would not be necessary. (Tr. 11/12/20 at 11.)

Allied exercised its last look rights for this project agreed to perform this job for the price identified in the February 6, 2014 bid. Allied did not object to any of the information that U.S. Steel provided, including the February 6 letter that indicated it contained updated pricing. (Ex. CN at AED_003313; Tr. 11/5/20 at 83.)

U.S. Steel issued a purchase order to Allied and Allied performed and completed the Blooming Mill Stacks project at Granite City. (Tr. 11/3/20 at 35:21-25; Tr. 11/5/20 at 85.) It was only after it completed the work and was paid did it learn of the communications by U.S. Steel with International Chimney.

Allied seeks lost profits of $35,000.00 with respect to this project which represents the difference in profits between the original bid and the subsequent reduced bid.

### 4. Setoff

On September 30, 2014, the court in the 2012 Litigation granted summary judgment in favor of U.S. Steel and against Allied on U.S. Steel's counterclaim in the sum of $10 million. (2012 Litigation, ECF No. 174.) The contract at issue with respect to U.S. Steel's counterclaim was the 2004 AIP, which was entered into on April 4, 2004. After a jury awarded Allied

approximately $1 million in June 2015 (2012 Litigation, ECF No. 290), the District Court entered

a final judgment in favor of U.S. Steel of $9.845 million in September 2015. (*Id.* at 94; 2012

Litigation, ECF No. 314; Ex. 272.) An amended judgment in favor of U.S. Steel of $10.6 million

was entered on March 17, 2016. (2012 Litigation, ECF No. 369.)

On August 6, 2015, Christine Breves, a U.S. Steel employee, directed a letter to Allied in

which she advised Allied that U.S. Steel would be offsetting against its judgment certain

outstanding invoices and future amounts that would otherwise be due to Allied. (Ex. 168.) As

relevant here, that impacted four projects: the Clairton T62 Light Oil Tank project; the Great Lakes

#2 Byproducts Scrubbers project; the Clairton Screening Station Removal project; and the Edgar

Thompson Slag Processing Roof Sheeting project.

> Article 5 of the 2003 Blanket Agreement provides that:
>
> In addition to its other remedies, [U.S. Steel] may withhold. . . out of monies due
> [by Allied], amounts sufficient fully to reimburse and compensate [U.S. Steel] for
> any loss or damage which [U.S. Steel] sustains, or may sustain, as a result of any
> default or breach by [Allied] of any of the provisions of this Agreement or the
> provisions of any contract executed by the parties and/or orders issued by [U.S.
> Steel] during the term of this Agreement, or by reason of any other claims [U.S.
> Steel]. . . may have against [Allied].

(Ex. 4 at Article 5.) Allied claims that U.S. Steel improperly threatened to offset, in advance,

amounts Allied would have earned for the Clairton T62 Light Oil Tank project, the Great Lakes

#2 Byproducts Scrubbers project, the Clairton Screening Station Removal project, and the Edgar

Thompson Slag Processing Roof Sheeting project. Allied did not perform work on any of these

projects.

In the Clairton Light Oil Tank project, Allied had initially exercised its last look rights but

declined to proceed after U.S. Steel requested confirmation that Allied would agree that any

amounts owed would be offset against the judgment. (Exs. 166, 169, 170; Tr. 11/3/20 at 38-40, 44-45.) Allied seeks lost profit damages of $30,373.00.

In the Great Lakes project, Allied declined to exercise its last look rights because U.S. Steel advised it that it intended to offset any amounts owed. (Exs. 187, 188; Tr. 11/3/20 at 46-48; Ex. DR at AED_003868, 003901; Tr. 11/5/20 at 114-15.) Allied is claiming lost profit damages in the amount of $133,710.00.

With respect to the Clairton Screening Station project, on the same day that U.S. Steel asked Allied to submit a proposal for this project, it also advised Allied that any amounts it would owe to Allied would be offset against Allied's obligation to U.S. Steel. (Ex. 195; Tr. 11/3/20 at 49.) When Allied submitted its project cost estimate, it also advised U.S. Steel that it would only perform this work if it was paid without accounting for any set-off. (Ex. 196; Tr. 11/3/20 at 49-50.) U.S. Steel rejected this term and indicated that it would not consider Allied for this work. (Ex. 197; Tr. 11/3/20 at 50-51.) It then competitively bid the project and did not offer Allied last look rights. (Ex. 197.) With respect to this project, Allied requests lost profit damages of $9,931.00.

Allied is claiming damages on the Edgar Thompson project based on similar facts. When U S. Steel asked Allied to submit a proposal for this project, it also advised Allied that any amounts it would owe to Allied would be offset against the Allied's obligation to U.S. Steel. (Ex. 204; Tr. 11/3/20 at 52.) When Allied submitted its project cost estimate, it advised U.S. Steel that it would only perform this work if it was paid without accounting for any set-off. (Ex. 206; Tr. 11/3/20 at 52-53.) U.S. Steel then rejected this term, competitively bid the project, and did not offer Allied last look rights. (Ex. 209; Tr. 11/3/20 at 53-54.) Lost profit damages of $64,369.00 are sought by Allied.

**5. Damages Related to Count I Claims.**

Mr. Anness calculated Allied's damages with respect to the Count I projects. In turn, Mr. Falconi offered expert testimony in which he challenged Mr. Anness' methodology and conclusions. As discussed below, the Court finds the testimony of Mr. Anness to be more credible.

By way of background, with respect to negotiated projects, Allied was required to provide U.S. Steel with an initial Project Cost Estimate. (*Id.* § 3(B)). The "negotiated" format had very specific contours about how Allied would be compensated for the work. (Tr. 11/2/20 at 115-21.) For example, all negotiated projects were performed on a "target gross margin" basis and the final Project Cost Estimate on each negotiated project established a cap on the Project Cost. (*Id.* § 3(H).) U.S. Steel was awarded a 10% discount on invoices for all negotiated projects to recoup the amounts U.S. Steel paid into a Prepaid Dismantling Account, reflecting dismantling projects completed by Allied for U.S. Steel prior to 2008 that generated gross margins in excess of 40% on a cumulative basis. (*Id.* § 3(I).) Any final Project Cost Estimate of a negotiated project included a charging rate schedule for labor and equipment that applied to extra work or work performed on a time and materials basis. (*Id.* § 3(K).) The combined direct and indirect cost of equipment utilized by Allied on negotiated projects was calculated pursuant to a specific rate schedule attached to the 2010 DSA. (*Id.* § 3(L).) Mr. Ramun testified that, when Allied provided estimates for negotiated work, U.S. Steel requested Allied to provide conservative or "worst-case" estimates, in order to minimize the need for change orders once the project commenced. (*See* Tr. 11/2/20 at 114, 128-29.)

By contrast, with respect to last look projects, Allied's compensation was based on its agreement to match the price in the most acceptable bid. Last look projects were fixed price, lump

sum projects. (Tr. 11/10/20 at 161.) Allied performed forty-five last look projects under the 2010 DSA. (Tr. 11/5/20 at 64-65; Tr. 11/10/20 at 158.)

All of the Count I claims are last look projects. In each of these claims, Mr. Anness calculated Allied's lost profits. The methodology he employed included assessing Allied's profitability on the last look projects it performed for U.S. Steel under the 2010 DSA. (Ex. 14.) He did so by selecting eight projects that he concluded were similar or comparable to the Count I projects at issue here. Mr. Lindquist compared these eight projects Allied performed to the last look projects Allied is claiming in Count I and confirmed that they were very similar and essentially the same work. (Tr. 11/9/20 at 34-37; 11/16/20 at 42-43; Ex. 609.) This testimony was not rebutted by any fact witness offered by U.S. Steel.

To calculate the damages for each project, Mr. Anness first calculated the revenue for each project at issue. (Ex. 14 at 3.) Revenue was calculated by adding together the "most acceptable bid" price for each project and the value of the ferrous scrap generated on each project. (*Id.*) Mr. Anness calculated the scrap revenue by first determining the ferrous scrap generated on each project, which was done either through the actual scrap weights obtained from U.S. Steel or estimated weights from Allied if no weight records were available. In order to confirm the reasonableness of Allied's scrap estimates, he compared Allied's estimates for those projects where actual scrap totals were available. In each instance Allied's estimates were lower than the actual scrap total which confirmed the conservative nature of Allied's estimates. (*Id.*) The value of the scrap was determined by applying American Metal Market pricing for the first week of the relevant month in which the scrap was generated, with $10 per ton deducted for freight as required by the DSA. (*Id.*; Ex. 7, Attachment 8; Tr. 11/16/20 at 33.) It is undisputed that American Metal

Markets is a recognized industry source for the valuation of ferrous and non-ferrous materials. (Tr. 11/16/20 at 31-32.)

Mr. Anness then calculated the lost profits for each Count I project by multiplying the anticipated revenue (the most acceptable bid price plus scrap value) by the average gross profit percentage for the eight "last look" projects that Allied completed under the 2010 DSA (32.7%). (Ex. 14 at 3, Exhibit B.)

According to Mr. Anness, Allied's average gross profit percentage on all of the completed "negotiated" projects under the 2004 DSA was 54.73% and was 55.33% under the 2010 DSA. (Ex. 14 at 3, Exhibit C.) Thus, Mr. Anness found the 32.7% number to be "very conservative." (*Id.* at 3-4; Tr. 11/16/20 at 44.)

Mr. Falconi disputed Mr. Anness' methodology and conclusions. Relying on the Project Cost Estimates that Allied provided to U.S. Steel in order to facilitate a negotiated project, Mr. Falconi testified that Allied would have lost money on all Count I projects in the amount of $2.6 million. (Ex. QR; Tr. 11/19/20 at 114, 122.) He stated that Mr. Anness did not consider Allied's projected costs, which were actual expected costs, and the total revenue Allied would have earned in completing these last look projects was lower than these projected costs. (Tr. 11/16/20 at 119-120; 122-126.) He further critiqued Mr. Anness' use of the eight completed projects for his calculation of Allied's lost profit margin, including but not limited to the fact that Mr. Anness did not perform any comparability analysis of these projects or consider the other thirty-seven completed projects. (Tr. 11/19/20 at 124-128.) Thus, he concluded that Mr. Anness artificially increased Allied's profit margins by using actual costs incurred on projects but estimated revenues derived from the project cost worksheets, that were higher than the actual revenues Allied earned. (Tr. 11/16/20 at 128-133; see also Ex. 14A, Ex. C.) Mr. Falconi also disputed the methodology

employed by Mr. Anness because he failed to calculate Allied's avoided costs when valuing the ferrous scrap that would have been obtained and sold by Allied if it had performed these projects. (*See, e.g.*, Tr. 11/16/20 at 111, 137, 138, 139.)[7]

The cross-examination of Mr. Falconi revealed inadequate investigation, a lack of understanding of the parties' contracts and documents and fundamental flaws in his analysis, all of which substantially undermined his credibility as a rebuttal expert witness. (*See, e.g.*, Tr. 11/20/20 at 6-7, 9, 10, 19, 29-30, 32, 34-35, 46, 48, 53, 62-63, 72, 82-83.) By way of example only, he did not review the 2010 DSA or its exhibits, some of which relate to allowable profit and revenue. (Tr. 11/19/20 at 165; Tr. 11/20/20 at 78.) He did not know that the processing fee used by Mr. Anness was drawn from the parties' contracts. (Tr. 11/20/20 at 34-35.) He did not seek relevant information from U.S. Steel, including but not limited to, its historical dismantling or processing costs. (*See, e.g.*, Tr.11/9/20 at 168-169; Tr. 11/20/20 at 10, 32, 46.) He did not understand key fundamental differences between negotiated and last look projects. (Tr. 11/20/20 at 53, 56, 78.) He did not understand how the Schedules of Contract Costs were compiled, including the fact that "estimated revenue" was the amount of the actual purchase order. (Tr. 11/20/20 at 65-83.) He did not understand the components of the initial cost estimates, that Allied's initial cost estimates were typically much higher than its actual incurred costs or that Allied submitted high initial cost estimates and still earned a profit. (*Id.* at 54-55, 61, 62-63, 70.) He did not realize that these schedules were adjusted downward from the initial project cost estimates to the accrual incurred profit margin set forth in the 2004 DSA and the 2010 DSA. (*Id.* at 73-79.) He offered no compelling or credible analysis to rebut Mr. Anness' conclusion that the eight last look projects he used are comparable to the Count I projects in dispute or to support his

---

[7] A further discussion of issues related to scrap valuation is provided with respect to Count II damages.

view that they were "cherry picked" as he testified. He did not seek any input from U.S. Steel regarding the comparability, or lack thereof, of the eight projects used by Mr. Anness. (*Id.* at 46.) He was not aware that these eight projects also had higher initial cost estimates by Allied but Allied nonetheless made an average profit of 32.7%. (*Id.* at 59-61.) He was not even aware of the number of last look projects performed by Allied for U.S. Steel. (*Id.* at 48.)

Thus, as Mr. Falconi's opinions regarding the calculation of Count I damages are flawed and lacking in any significant weight, and Mr. Anness has adequately supported his damage analysis, the Court finds Mr. Anness' calculation of Allied's lost profits to be proven with reasonable certainty.

E. Railcar/Barge Dismantling (Count II)

Allied's claim in Count II relates to U.S. Steel's failure to honor Allied's "last look" rights in connection with the dismantling of various railroad cars and barges decommissioned by U.S. Steel. As set forth in the parties' Joint Stipulation of Facts (ECF No. 174), pursuant to a stipulation and the verdict in the 2012 Litigation, liability is not contested with respect to Count II.[8] The only contested issue are the damages, if any, to which Allied is entitled.

Mr. Anness calculated Allied's damages in Count II to be $915,314.00 (without interest), consisting of the profit that Allied would have earned if it had dismantled various railcars and barges. He testified that his methodology for doing so was as follows:

> The starting point . . . was the rail car data provided by U.S. Steel in the updated Transtar report. The weights for the cars were obtained either from U.S. Steel, if

---

[8] In that action, Allied asserted a breach of contract claim under the 2010 DSA relating to U.S. Steel's failure to honor Allied's "last look" rights in connection with the dismantling of various railroad cars and barges decommissioned by U.S. Steel. In the 2012 Litigation, the parties agreed that Allied's claim for barge and railcar work denied to Allied by U.S. Steel would include only those barges and railcars quantified by the January 6, 2014 Gleason Report (Allied's damages expert in the 2012 Litigation) and that U.S. Steel's liability for any additional claims for barge or railcar work denied to Allied under the 2010 DSA would be conclusively governed by the determination of the jury in the 2012 Litigation. (Ex. 273.) The jury subsequently returned a verdict in favor of Allied on this claim and awarded damages. (Ex. 271.)

provided, or from Allied's estimates if no actual weight data was available. The pricing was based on American Metal Market Consumer Buyer Prices, for the first week of each month for 5' plate and structural prepared. Once the scrap revenue was determined, we then subtracted the contract amount paid by the party awarded this work and a processing fee per gross ton. The $75 per ton processing fee was the same amount used in the earlier damage analysis and was based on Allied's actual cost to dismantle rail cars at U.S. Steel's Gary Works plant. The $56.25 processing fee is the cost on projects where non-union labor was permitted. The lost profit is the difference between the lost revenue and the avoided costs (i.e., the contract amounts and processing fees).

(Ex. 14 at 5; Ex. D.)

The Transtar Freight Car spreadsheet which Mr. Anness utilized was prepared and provided by U.S. Steel. (Ex. 274; Tr. 11/13/20 at 187). The Transtar report accurately represented all railcars sold, offered for sale, disposed of, or dismantled by U.S. Steel from January 1, 2012, to December 31, 2015. (Tr. 11/13/20 at 187-88; Ex. 653.) Joseph Manga, a process engineer employed by U.S. Steel, testified that most of the PSDs for the railcar projects included estimated weights for the railcars that were provided by the railroads and that U.S. Steel believed these estimates to be accurate. (Tr. 11/13/20 at 191.) There was also an "average weight" for the railcars disposed of by U.S. Steel. (*Id.* at 193-94.)

For his calculation, Mr. Anness used actual railcar weights, when available, or data from U.S. Steel, such as PSDs, which stated the weights of the railcars to be dismantled. (Ex. 14 at 5; Anness Report, Ex. D.) When that data was not available from U.S. Steel, Mr. Anness relied on estimated or historical railcar weights provided by Mr. Lindquist, an experienced estimator, which included detailed references to previous Allied railcar sales and similar railcar types. (Tr. 11/9/20 at 50-59; Ex. 609; Ex. 14 at 5.) Mr. Lindquist has been involved in the dismantling of over a thousand railroad cars and has extensive experience with estimating and determining the weights of railroad cars. (Tr. 11/9/20 at 22-25.)

Mr. Anness used the same methodology and processing costs used by Mark Gleason, Allied's accounting expert in the 2012 Case. (Tr. 11/16/20 at 55; Ex. 17 at 45-46, n.184 and Exhibit O to the Gleason Report.) Mr. Gleason's analysis included the use of a $75.00 per gross ton processing cost for processing that was done at the Gary facility. (*Id.*) Mr. Gleason's methodology and cost numbers were accepted by the trial court in the 2012 Litigation. (Ex. 271.) This processing cost was also used by another contractor, Tube City, in railcar dismantling work it performed for U.S. Steel. (Tr. 11/20/20 at 19-24.) Mr. Gleason's report indicated that Allied's costs to dismantle cars at the Gary facility is comparable to the costs of Tube City, which is a large processor of scrap for U.S. Steel. (Tr. 11/20/20 at 21-22.) Further, this was the same amount that the parties had regularly utilized for a six-to-eight-year period and agreed in writing to use in at least two prior agreements. (Tr. 11/16/20 at 36, 73.)

The $56.25 scrap processing fee used by Mr. Anness with respect to non-union projects was the same fee that the parties had used in prior agreements. (Tr. 11/16/20 at 36, 73.) Mr. Anness applied the same processing fee to all sites at which the railcars and barges were located, including sites where Allied did not have the same continuous operations or equipment as it did at Gary. (Tr. 11/16/20 at 149.) In applying the same processing fee to all sites at which the railcars or barges were located, he relied on his discussions with Allied's management. (*Id.*)

Mr. Anness testified that to a reasonable degree of professional certainty, Allied's estimated lost profits for the Count II projects to be determined were $915,314.00, excluding interest. This calculation includes a downward correction related to his misinterpretation of a purchase order that he made in his initial analysis. (Tr. 11/16/20 at 52; Tr. 11/20/20 at 26-27.)

James Falconi, U.S. Steel's accounting expert, did not provide an alternative opinion regarding Count II damages, nor was he required to do so. He did not challenge Mr. Anness'

revenue calculation or the railcar weights. (Tr. 11/19/20 at 144-48.) Rather, he opined that Mr. Anness did not properly calculate Allied's lost profits because he failed to analyze avoided costs. (Tr. 11/19/20 at 153.) Specifically, Mr. Falconi concluded that the processing fees per gross ton utilized by Mr. Anness were not adjusted for various factors, including inflation, variables at different sites or what was being demolished. (*Id.* at 153-54.)

Thus, the sole issue in connection with Allied's damage claim is the processing fees that Mr. Anness used as a component of his calculations.

Mr. Falconi was also one of U.S. Steel's experts in the 2012 Litigation. Mr. Gleason's use of this price per ton was not questioned or challenged in the expert report signed by Mr. Falconi and his colleagues and submitted on behalf of U.S. Steel. In relevant part, their report addressed Allied's damages with respect to the same claim asserted here, that is, U.S. Steel's refusal to provide Allied its "last look" rights for the railcar and barge work. (Tr. 11/20/20 at 18-24.)

The Court gives substantially more weight to the opinions of Mr. Anness as to the damages sought by Allied. Mr. Falconi did not request or receive from U.S. Steel any data about processing railcars or a scrap processing fee. He signed an expert report in the 2012 Litigation that did not challenge the use of the same processing fee, a fee that was derived from the experience of a third party, Tube City, with whom U.S. Steel had extensive dealings. The same claim is asserted in both cases. Mr. Anness relied on information supplied by Allied, which is in the business of dismantling. Although Mr. Falconi pointed out that there may be variables that would affect the use of $75.00/ton, the Court does not find that the use of this figure was unreasonable under the circumstances.

## F. Additional Compensation (Count III)

Allied alleges that U.S. Steel disrupted Allied's work on certain projects and/or required Allied to perform extra work unrelated to the scope of work and subsequently denied Allied's requests for additional compensation. This includes the following projects: Great Lakes Sulphate Building; Great Lakes #2 Ore Dock Trestle; Great Lakes 36" COG Line Removal; Great Lakes #2 Coke Battery Screening Station; Gary #7 Blast Furnace Stockhouse Bins; and Minntac.

Mr. Lindquist was Allied's General Superintendent for all of these projects. (Tr. 11/9/20 at 61.) His role included conducting the initial site visit, attending pre-bid and safety meetings, preparing a proposal for the identified scope of work, and preparing a work plan. (*Id.*) He evaluated the most acceptable bids for each of these projects and performed analyses of the labor and equipment hours related to the change orders Allied submitted. (Tr. 11/9/20 at 29-33, 65-66, 67.) After these projects were awarded, he visited the job sites, discussed them with Allied's on-site superintendents, reviewed the Computerized Daily Reports ("CDRs") and interacted with U.S. Steel personnel regarding the projects and Allied's requests for additional compensation. (*Id.* at 62-64.) Allied's CDRs were prepared by Allied's superintendents in the ordinary course of business, were provided to U.S. Steel, and were collected and reviewed by Mr. Lindquist daily. (Tr. 11/9/20 at 15; Ex. 606.)

### 1. Great Lakes Sulphate Building

While this project was originally a negotiated project for which Allied submitted a proposal (Ex. HZ at AED 4798-99), U.S. Steel decided to competitively bid this project. (Tr. 11/5/20 at 6.) The bid package that states that "change orders will not be granted unless [U.S. Steel] requests a change in project scope, methods, schedules, or dismantling plans. Change orders must be approved with a proper PO revision document prior to performing any additional work." (Ex. IB

at AED 4940; Tr. 11/5/20 at 7:10-18.) Allied exercised its last look rights and agreed to perform the work for $240,550, the amount of the most acceptable bid. (Ex. IE at AED 4964; Tr. 11/5/20 at 9.)

U.S. Steel was responsible for abating the asbestos at the site before Allied began its work (Ex. 373 at AED 4851, 4854; Tr. 11/13/20 at 76), and represented to Allied that it had been removed. (Tr. 11/9/20 at 75.) After Allied began its work, however, asbestos was discovered on the roof sheeting of the building, and U.S. Steel directed Allied to stop work pending remediation by U.S. Steel. (Exs. 382, 391; Tr. 11/9/20 at 72.) The project was shut down for forty-seven days, resulting in layoffs and idled equipment. (Tr. 11/9/20 at 76-79.) In a letter to Allied, Paul Falkenhan of U.S. Steel acknowledged that this was an "unexpected delay" and agreed to compensate Allied for "all reasonable costs incurred by [Allied] as a result of this delay." (Ex. 385.) He also stated that U.S. Steel would not pay costs associated with hiring and retaining employees or any claim for idled equipment unless it was rented and a daily fee was incurred. (*Id.*)

Allied subsequently issued two change order requests. (Tr. 11/5/20 at 9.) In Change Order Request No. 1, it sought $331,089.00, later reduced to $325,173.00, which it attributed to delays relating to the asbestos removal. (Ex. 391.) These costs were attributed to six pieces of idled equipment ($326,232.00), hourly costs for re-testing and re-training workers ($9,788.64) and the value of ferrous scrap that was removed by U.S. Steel during the remediation in the amount of $4,857.00. (*Id.*; Exs. 84, 392.) Mr. Lindquist calculated the labor and equipment hours associated with the delay. (Tr. 11/9/20 at 81; Tr. 11/13/20 at 59-64; Ex. 81, Ex. 393 at AED 44778.)

Initially, U.S. Steel advised Allied that it was not willing to pay Allied for the costs of the idled equipment and re-testing and training. (Ex. 385.) It contended that Allied did not redeploy

its equipment to other sites and its CDRs reflected that the equipment was still in use. (Tr. 11/12/20 at 109-111; Ex. 606 at Tab 5; AED 9774-75.)

U.S. Steel later requested additional information about Allied's claim. (Tr. 11/9/20 at 82-83; Tr. 11/3/20 at 70-73; Ex. 84.) Allied submitted a letter dated June 17, 2015, that provided detail as to the specific pieces of equipment related to the claim, the time periods that the equipment was idle, and the rates used to calculate the request. (Ex. 84.) Mr. Lindquist also provided an estimate of the value of the scrap removed by U.S. Steel. (Tr. 11/9/20 at 82-83.) U.S. Steel did not pay this change order.

Mr. Lindquist testified that due to the nature and uncertainty of the extent of the delays caused by U.S. Steel's requirement to abate asbestos and the cost associated with demobilizing and then remobilizing Allied's large pieces of construction equipment, it was not feasible to redeploy any equipment as suggested by U.S. Steel. (Tr. 11/9/20 at 77-78.) He also testified that none of the idled equipment for which Allied asserted compensation in Change Order Request No. 1 was still in use, and he only counted days during which the equipment was actually idle. (Tr. 11/12/20 at 110-11; Tr. 11/13/20 at 59-61; *see also* Ex. 84.)

Allied submitted Change Order Request No. 2 in which it requested $55,904.00 for the use of a crane and additional laborers to lift down the structural steel at the west end of the structure. (Ex. IK at AED 5025; Tr. 11/5/20 at 10; Tr. 11/12/20 at 103.) The request was made prior to the commencement of the anticipated work. (Ex. IK.) U.S. Steel denied the request for a change order. (Ex. IL.)

Evidence was presented at trial regarding this claim. (Tr. 11/9/20 at 87-88; Ex. 393, Bates Nos. 44967-68, 44975, 44977.) Allied asserts that the use of the crane was unforeseen and was permitted by U.S. Steel's Gary Cornelius. (Ex. 387; Tr. 11/9/20 at 83-90.) Thus, Allied asserts,

U.S. Steel approved of a change in method by the use of a crane, which was a change from the methods and equipment in the most acceptable bid. (Ex. IK.) Allied required the use of an extra crane due to the need to lower the structural steel at the west end of the structure rather than dropping the structure as outlined in its workplan and in the most acceptable bid. (Ex. 387; Tr. 11/9/20 at 83-90.)

While the most acceptable bid did not include a crane (Ex. 378; Tr. 11/9/20 at 85), the use of a crane is a rigging method that was permitted as an approved dismantling method in the PSD. (Ex. HZ at AED 4811; Tr. 11/5/20 at 5; Tr. 11/12/20 at 92.) U.S. Steel denied this change order request because it did not request a change in the dismantling method. (Ex. IL at AED 5036; Tr. 11/5/20 at 11.) U.S. Steel neither directed Allied to complete work outside the scope of the project or engaged in any conduct that delayed or prevented Allied's work.

Allied has calculated the total amount of Change Order Request No. 2 as $55,904.00. (Tr. 11/9/20 at 87-88; Ex. 393, Bates Nos. 44967-68, 44975, 44976, 44977.)

### 2. Great Lakes Ore Dock Trestle

Allied performed and completed this negotiated project. (Tr. 11/3/20 at 77.) Both parties were aware of the existence of coke oven gas ("COG") that would have to be purged by U.S Steel before Allied could perform its work. (Tr. 11/9/20 at 92; Tr. 11/12/20 at 77-78.) It was U.S. Steel's responsibility to purge the line before Allied's demolition work started. (Tr. 11/9/20 at 92.) However, U.S. Steel was unable to achieve a successful purge. (*Id.*) This stopped Allied's work on this project. (Ex. 332; Tr. 11/9/20 at 96.) In addition, U.S. Steel's subcontractor did not timely and properly complete the water cutting of the COG line which was necessary predecessor work. (*Id.* at 93, 113.) As a result, "extra time was required with burners and equipment to remove the pipe in one long section to be cleaned west of the east section of the trestle." (Ex. 328,

AED 6059; *see also* Ex. 329, 332.) Allied had to complete this work in a different manner than as planned. (Tr. 11/9/20 at 94-95.) The fact that the COG line also had coke oven gas that had not been purged that made it more difficult to remove before the dismantling of the east end of the #2 Ore Trestle was possible. (Ex. 329.)

Allied submitted a change order request of $82,402.00 for additional costs related to the removal of the coke oven gas line under the ore dock trestle. (Ex. 329; Tr. 11/9/20 at 90-96.) Allied asserts that it was necessary to commit extra time and labor to remove the line, which increased its costs. (Ex. 328; Tr. 11/9/20 at 94-95.) Mr. Lindquist testified that he determined the extra time and labor that supported these costs by using the CDRs. (Tr. 11/9/20 at 94-95; Tr. 11/13/20 at 64-67; Ex. 335 at 44854-56.) While a document was admitted into evidence that reflects Allied's calculation of costs associated with this change order (*see* Ex. 393 at 44865), Mr. Lindquist admitted, however, that the CDRs in evidence on which he stated he relied do not have any backup for the labor and equipment hours in the change order request. (Tr. 11/12/20 at 89-90.)

U.S. Steel denied the change order request because it was not submitted in writing prior to performing the work. (Tr. 11/3/20 at 81-82.)

### 3. Great Lakes 36 Inch COG Line Removal

Allied matched the terms of the most acceptable bid for this project and U.S. Steel issued a purchase order. (Ex. 357; Ex. 358.) Allied performed and completed the project which involved the demolition of an elevated COG line. (Tr. 11/3/20 at 85.) The PSD issued by U.S. Steel provided that no more than two cranes would be necessary to perform this work. (Tr. 11/9/20 at 97-98; Ex. 356, Bates No. 5584.) The PSD also included the following information: the contractor was responsible for providing all supervision, labor, tools, and equipment; the contractor was to

assume that the 36-inch COG line was completely full of COG residue; the COG line was supported by 40 steel brackets that were in various stages of deterioration; the contractor was to coordinate the removal activities with an environmental contractor who would cut the COG line; and approved dismantling methods include mechanical, rigging, and hand work. (Ex. LO at AED 1595-1599; Tr. 11/5/20 at 23-24; Tr. 11/12/20 at 20.) Mr. Lindquist took these matters into account when he drafted the work plan. (Tr. 11/12/20 at 21-22.)

At issue are two of Allied's changes order requests on this project, both of which include the use of a third crane. Both were submitted after Allied's work was completed. (Ex. 366.) U.S. Steel denied Allied's requests for additional compensation as to both change order requests because the required advance written change order was not submitted. (Tr. 11/5/20 at 33-35.)

As a result of a bracket that broke while Allied was removing a portion of the COG line, it submitted Change Order Request No. 2 for the use of a third crane. (Tr. 11/9/20 at 98-100; Ex. 360, Tr. 11/5/20 at 32-33.) Before doing so, Mr. Lindquist explained the need for an additional crane to Mr. Cornelius of U.S. Steel and he directed Allied to proceed. (Tr. 11/9/20 at 99; Ex. 360.)

Change Order Request No. 3 was also submitted by Allied related to the use of a crane near the completion of the project which was also related to the deteriorated brackets. (Tr. 11/9/20 at 109-110; Tr. 11/5/20 at 33-34; Ex. LY at AED 1747.)

Mr. Lindquist calculated the additional labor and equipment hours due to these issues. Based on these calculations, Allied calculated the total amount of Change Order Request Nos. 2 and 3 to be $101,428. (Tr. 11/9/20 at 110-113 Ex. 367 at 44971.) In addition to costs associated with the use of a third crane, this figure also includes additional costs associated with a subcontractor of U.S. Steel who was delayed in completing the water cutting of the COG line, at

least in part due to freezing water issues, and delays in the purge of the line. (Tr. 11/9/20 at 101-109; Ex. 360.) This was work that had to be completed before Allied could do its demolition work. (Tr. 11/9/20 at 107.)

Allied's claim in its two change order requests that relate to the use of a third crane are requests for additional compensation for work within the scope of the work it agreed to perform. Allied was advised before it accepted this project that the brackets were in various stages of deterioration. U.S. Steel did not request a change in the scope of the work or the method by which Allied was directed to do its work. Moreover, with respect to delays associated with weather, the Court previously ruled that weather-related delays do not represent a delay caused by U.S. Steel for which Allied can seek compensation. (ECF No. 66 at 16.)

### 4. Great Lakes #2 Coke Battery Screening Station

Allied agreed to match the most acceptable bid for this project. (Ex. 342.) The project scope document includes the following information: the contractor was responsible for providing all supervision, labor, tools, and equipment; asbestos was a possibility on the project site; work would be performed within six feet of a railroad track; the tracks would at times be locked out; and approved methods of dismantling were mechanical, rigging, and hand work. (Ex. KZ at AED_006122-25; Tr. 11/5/20 at 36-38; Tr. 11/12/20 at 55-56.) It was U.S. Steel's responsibility to remove asbestos from the facility before Allied started its work. (Ex. 337 at 3.)

After Allied started its work, asbestos was found and Allied was instructed by U.S. Steel to lay off all of its personnel and leave the site until remediation was completed. (Ex. 344.) Allied advised U.S. Steel because of the shutdown of the job, it would no longer have access to its hydraulic crane, and U.S. Steel would be responsible for providing a crane and operator for the project. (*Id.*) The crane was shipped by Allied to its Youngstown facility because it was selling

off some of its equipment, including this crane. (Tr. 11/12/20 at 61-62.) Allied also advised U.S. Steel that it would incur added costs for exit physicals and subsequent retesting for new hires. (*Id.*)

The asbestos remediation caused approximately forty-nine days of delay to Allied's work. (Ex. 349, at Bates No. 6308.) In addition, as directed by Garret Salomon of U.S. Steel and inconsistent with the work plan of the most acceptable bid, Allied was not permitted to drop the structure but instead was required to lift the structure down with a crane. This caused the work to take longer and required Allied to run cables through the legs of the structure to provide additional support during dismantling, which resulted in additional equipment and manpower. (*Id.*; Tr. 11/9/20 at 124-41; Ex. 340.) There were also inefficiencies and delays in having to move the crane, as directed by U.S. Steel, in order to accomplish the work. (Tr. 11/9/20 at 131.)

Allied submitted Change Order Request No. 1 on June 9, 2015 for $576,279.00. (Ex. 349, at Bates No. 6308.) This change order request was comprised of $504,407.00 for various delays and changes in work plan. It also included $71,872.00 for Allied's loss of scrap value based on the one-year delay of the start of the project. (*Id.*) There was not testimony or evidence presented regarding any requirement to commence a project within a defined period. Change Order Request No. 1 included requests for compensation due to weather delays. (Ex. 349 at AED 6316-6320.)

U.S. Steel acknowledged in correspondence with Allied that the discovery of asbestos constituted a compensable delay. (Ex. 345.) U.S. Steel stated that it would consider "all reasonable and documented costs" incurred by Allied as a result of the delay but would not compensate Allied for costs associated with the hydraulic crane and the laying off and re-hiring of employees. (*Id.*)

The delays in Allied's work were itemized for U.S. Steel in a narrative prepared by Mr. Lindquist that provided a breakout as to the basis for the delay and the hours associated with each

of the delays. (Ex. 349 at 6310-6321.) Utilizing the CDRs, Mr. Lindquist calculated the labor and equipment hours associated with these delays. (Tr. 11/13/20 at 73-74; Ex. 352 at 44931.) Allied calculated the total amount of this change order as $576,279.00. (Ex. 349 at 6308.)

### 5. Gary #7 Blast Furnace Stockhouse Bins

Allied matched the terms of the most acceptable bid for the Stockhouse Bins project at Gary and performed the work. (Ex. 281; Tr. 11/3/20 at 105.) In the PSDs for this project, which was an operational plant, U.S. Steel stated that plant operations would delay labor and equipment by 10%. (Tr. 11/4/20 at 158:2-7; Tr. 11/12/20 at 116:16-21.) The 10% work delay factor "due to operations" in the PSDs covered normal U.S. Steel operations, not excessive interference outside of those normal operations. (*Id.* at 147-49.)

Allied's claim is based on Change Order Requests Nos. 1, 2 and 3 in the amounts of $39,560.00, $18,340.00, and $28,132.00, respectively.

Allied submitted Change Order Request No. 1 on November 7, 2012, for additional costs it incurred due to delays by plant operations on various dates in September and October 2021. Change Order Request No. 1 attached the CDRs that specified the plant operations at issue and the days and times on which Allied was impacted. (Ex. 289.) This change order was prepared by Mr. Lindquist based upon his personal knowledge of the project and his review of the CDRs, which reflected excessive plant operations that Allied claimed interfered with its work. (Ex. 606; Tr. 11/9/20 at 158-160.) Mr. Lindquist testified that he did not include any delays that were within the expected 10% of plant operations referenced in the PSD. (Tr. 11/9/20 at 151.) U.S. Steel acknowledged that this change order included "legitimate" claims; there was a dispute only about the number of claimed hours. (Ex. 294; Ex. 296; Tr. 11/9/20 at 161-68.) U.S. Steel had all of the CDRs for review. (Tr. 11/9/20 at 161-68.)

Allied submitted Change Order Request No. 2 on December 27, 2012 for the additional costs of manpower and associated equipment due to the various delays caused by plant operations on various dates in November 2012. (Ex. 303.) Mr. Lindquist provided the summary that specified the plant operations that interfered with Allied's work. (Tr. 11/9/20 at 168-69.) This summary was prepared from the CDRs, which were provided to U.S. Steel. (*Id.*)

Allied submitted Change Order Request No. 3 on January 9, 2013 for the additional costs incurred for manpower and associated equipment due to delays by plant operations during various dates in November and December 2012. (Ex. 306.) Again, Mr. Lindquist provided a summary prepared from the CDRs that specified the plant operations that interfered with Allied's work. (Tr.11/9/20 at 168-69.)

Based on the evidence submitted by Allied regarding the reasons for the delays, Allied demonstrated and U.S. Steel did not refute that these plant operations were not the normal operations within the 10% contingency referenced in the PSD. (*Id.* at 170.)

### 6. Minntac

Allied also asserted a claim in connection with the Magnetic Separator Roll Removal Project at U.S. Steel's Minntac facility in Minnesota ("Minntac"). This plant produces taconite pellets used in blast furnaces to create steel. A component of the production process is the magnetic separator, which consist of sixteen parallel operating lines that essentially run constantly, year-round. (Tr. 11/17/20 at 6-7.) The Minntac project involved replacing the old lines with new and more efficient lines. (Tr. 11/17/20 at 9:9-10:20.)

The pre-bid meeting minutes indicate that change orders would not be granted unless U.S. Steel requests a change in project scope, methods, schedules, or dismantling plans, and that change orders must be approved prior to performing any additional work. (Ex. IS at AED_005488; Tr.

11/4/20 at 116:5-13.) U.S. Steel's Request for Quote sent to all bidders indicates that U.S. Steel reserved the right to terminate the winning demolition contractor if it could not adhere to the project timeline or successfully coordinate its movements with the installation contractor. (Ex. IS at AED_005486; Tr. 11/4/20 at 115:3-23; Tr. 11/12/20 at 154:2-155:7.) The revised bid package that U.S. Steel sent to all bidders stated, among other things, that change orders would not be granted unless U.S. Steel requested a change in project scope, methods, schedules, or dismantling plans, and the demolition contractor's failure to adhere to the project completion timeline or failure to coordinate with the installation contractor would result in U.S. Steel terminating the purchase order. (Ex. IU at AED_005539-42; Tr. 11/4/20 at 17:11-118:18.)

This was a last look project. (Tr. 11/4/20 at 113-114.) The most acceptable bid was submitted by Brandenburg and provided that the project was to be performed with one crew at a lump sum price of $720,115.00. (Ex. 407, Bates No. 4147; Tr. 11/9/20 at 180.) Jamar, the company that performed the installation work, had also bid on the demolition work ultimately awarded to Allied (Tr. 11/18/20 at 109) and had a longstanding relationship with U.S. Steel. (Tr. 11/18//20 at 217-219.) Brett Cahoon, Jamar's project manager on the Minntac project (Tr. 11/18/20 at 107:6-10; 107:24-108:6; 124:6-10.), testified by deposition at trial.

Mr. Lindquist conducted a walk-through at the Minntac project site, prepared an initial proposal and work plan, attended the pre-bid meeting and evaluated the most acceptable bid for the project. (Tr. 11/9/20 at 172; Tr. 11/10/20 at 178.) He later ran the job as an on-site superintendent for one week. (*Id.*) Mr. Lindquist prepared his work plan based on Brandenburg's bid. (Ex. 416; Tr. 11/9/20 at 174-75.)

Allied exercised its last look rights and agreed to perform the work for the lump sum price of $720,115.00. (Ex. HA at AED_004369; Tr. 11/4/20 at 164:22-165:13.) Its work plan provided

both that "outage demolition" would be performed on the first day of the outage ("(i.e. two ten hr. shifts)") (Ex. 416 at 4164) and that the outage dismantling would be performed on a "12-hour shift on Monday." (Ex. 416 at 4169.) U.S. Steel did not object to this work plan. (Tr. 11/9/20 at 174-75, 180-181.) An updated schedule provided by Allied indicated that it planned to use two ten-hour shifts, but only for the first day. (Tr. 11/4/20 at 124-125.)

Robert Wilmunen was the engineering manager for U.S. Steel, Minnesota Ore Operation and oversees capital projects such as the installation of new and upgraded equipment. (Tr. 11/17/20 at 4-5.) He oversaw the Minntac project during its entirety and was on site about once a week. (Tr. 11/17/20 at 13, 34, 38, 89.) Hatch was an engineering consultant retained by U.S. Steel to assist it in planning this project. (Tr. 11/12/20 at 138.)

The Minntac plant was able to designate one line per week to shut down for five days so that Allied could dismantle the old units and Jamar, the installation contractor, could install the new units. It was critical that the outage work be completed within the first 24 hours of each week, followed by the non-outage work. (Tr. 11/17/20 at 16:18-18:3.) Once the outage work was complete, Allied was to move to the separator line that was upgraded during the previous week and complete the non-outage demolition for that line. Non-outage work consists of all remaining demolition work for a given separator line. (Ex. IQ at AED_005379; Tr. 11/4/20 at 111, 112.)

The project started on April 14, 2014. (Tr. 11/9/20 at 176; Tr. 11/20/20 at 36.) Allied was to perform outage work on the first day so that installation then could be done by Jamar. (Tr. 11/13/20 at 5.) Allied made a series of missteps the first day. (Tr. 11/9/20 at 176-77.) It experienced difficulty obtaining tools as well as obtaining laborers out of the local union hall due to other U.S. Steel outages. (*Id.* at 177; Ex. JH.) In addition, MSHA found violations by Allied on its first day of work. (Ex. 427; Tr. 11/13/20 at 11-12.)

Allied used only one shift of workers on the first day. It fell behind on the project and Jamar had to come in and finish Allied's work. (Tr. 11/9/20 at 177, 178-79; Tr. 11/10/20 at 26; Tr. 11/13/20 at 6-7; Tr. 11/17/20 at 46.) U.S. Steel issued a change order to Jamar so that it could complete Allied's work. (Ex. JF; Ex. JH; Tr. 11/13/2020 at 6:12-7:3; Tr. 11/18/2020 at 46:2-15.) This did not delay the overall project. (Tr. 11/10/20 at 30-32; Ex. JH.)

According to Brett Cahoon of Jamar, Allied failed to properly plan, did not have sufficient tools and manpower, and caused safety concerns. (Tr. 11/18/20 at 152, 202-203.) Joseph Manga of U.S. Steel noted it had been the preference of U.S. Steel personnel that Jamar perform the demolition work. (Tr. 11/13/20 at 176.) After Allied's issues during the first week, some, including Mr. Wilmunen, along with Darren Gietzen of Hatch, wanted to replace Allied. (Tr. 11/17/20 at 93-94.) Mr. Wilmunen believed that Jamar would have been a better fit. (*Id.* at 103.)

The demolition schedule at Minntac was based on taking out sixteen concentrator lines in a defined sequence. (Ex. 414.) This schedule changed during the course of the project, including changes to the sequence of the lines to be demolished. (Tr. 11/9/20 at 181-82, 185; Tr. 11/10/20 at 21.) The schedule for five of the eight lines on which Allied was involved changed. (Tr. 11/10/20 at 48-50.) These changes were made by U.S. Steel and were due to operational issues and problems U.S. Steel had at the plant. (Tr. 11/9/20 at 181-85.) The line sequencing changes impacted Allied's work. (Tr. 11/9/20 at 181-82.)

Paul Falkenhan directed a letter to Allied on April 28, 2014 in which he relayed U.S. Steel's significant concerns regarding Allied's performance on the project and its failure to provide sufficient labor, equipment and tools. (Ex. JO.) He directed Allied, among other things, to staff two full work crews and provided notice pursuant to Article 9 of the 2003 Blanket Agreement (Ex. 7) that if Allied did not comply with U.S. Steel's requirements within three days, U.S. Steel would

exercise its contractual rights, which included termination. (*Id.*) In his April 30, 2014 response, Mr. Ramun noted that the most acceptable bid only included one shift but agreed to supply a second shift and noted that Allied would submit a change order request for its associated additional costs. (Ex. 441.) Allied also disputed U.S. Steel's contentions about its performance. (*Id.*)

As stated in the May 7, 2014 email of Mr. Manga, Allied was "still on pace to be completely caught up by the end of the week." (Ex. 446; Tr. 11/13/20 at 174, 193.) On May 8, 2014, Mr. Manga stated that "Allied continues to make steady progress. Both the plant and Jamar seem to be happy with their current status." (Ex. 448; *see also*, Exs. 460, 470.)

U.S. Steel terminated Allied on May 30, 2014. (Tr. 11/9/20 at 176.) Part of the reason for its termination was because Allied had submitted change order requests. (Tr. 11/17/20 at 147.) U.S. Steel refused to allow Allied to take the scrap it had accumulated during the course of its work, scrap which Allied owned under the contract. (Tr. 11/10/20 at 54.)

A May 30, 2014 chart attached to an email from U.S. Steel's Ken Nolan the final status of Allied's work as of the date of its termination. (Tr. 11/18/20 at 46.) When Allied was terminated, it was caught up on all outage and non-outage work. (Tr. 11/18/20 at 45-63.) When Mr. Lindquist asked Mr. Cornelius, the person in charge of facility redeployment at U.S. Steel, why U.S. Steel was terminating Allied, Mr. Cornelius responded, "I don't know. It's pretty stupid." (*Id.*)

Allied is seeking damages for wrongful termination and its claim includes certain damages related to three of the change order requests (Requests 1, 2 and 4) that it submitted to U.S. Steel. Change Order Request No. 1 was submitted on May 9, 2014 and requested additional compensation in the amount of $96,111.00 relating to additional equipment and labor time Allied claims to have incurred due to U.S. Steel's direction requiring that the scrap processing area specified on Mr. Lindquist's work plan (Ex. 416 at 4170) be moved from just outside the work

area to over a mile away. (Ex. JS at 5610; Tr. 11/4/20 at 129-130.) Mr. Lindquist notified U.S. Steel that "because of all the double handling and extra distance this is a change in the scope of work and will require a change order." (*Id.*) U.S. Steel employee Gary Cornelius agreed and stated that "these are substantial changes in scope." (*Id.*)

Allied did not have to add any equipment or laborers in order to haul scrap the additional distance (Tr. 11/13/20 at 21-22) but lost the use of an operator for the extra hauling time. (*Id.*) When it submitted Change Order Request No. 1, Allied based its calculations assuming that it would be hauling scrap for the entire sixteen-week project. (Tr. 11/4/20 at 146.) U.S. Steel admitted that Change Order Request No. 1 represented a compensable claim but offered to reimburse Allied only for its fuel cost. (Ex. 464.) No evidence was presented at trial regarding Allied's fuel cost.

Allied submitted Change Order Request No. 2 for $89,722.00 on May 9, 2014. This request relates to an additional week that U.S. Steel added to the project due to operational issues experienced with Line 15. (Ex. 451; Tr. 11/10/20 at 44-50.) U.S. Steel admitted that the extension of the project schedule by one week was compensable. (Ex. 462.) However, it disputed the net amount of the additional compensation sought by Allied and agreed only to provide a $12,510.30 payment limited to equipment because Allied's manpower was fully utilized during the additional week. (*Id.*) Mr. Wilmunen testified that Change Order Request No. 2 was not valid because, among other things, the extra week did not add any scope to Allied's work and as such, no additional compensation was owed because this was a lump sum project. (Tr. 11/17/20 at 72:7-73:3.) Moreover, as Allied was behind schedule, this would give it the chance to catch up on its work. (*Id.*)

Allied submitted Change Order Request No. 4 on May 21, 2014 for $519,801.00 regarding U.S. Steel's directive that Allied add a second shift each Monday and four additional workers for the remainder of each week of the job. (Ex. 463; Tr. 11/10/20 at 51-53.) The most acceptable bid planned only one crew for the work. (*Id.*) After the project started, U.S. Steel directed Allied to add a second crew for the remainder of the job. (Ex. 440; Tr. 11/10/20 at 52-53.) Pursuant to this directive, Allied added a second crew in early May. (Ex. 448; Tr. 11/10/20 at 50-52.) In Mr. Falkenhan's May 23, 2014 letter to Allied, he expressed U.S. Steel's disagreement that Allied was entitled to additional compensation and informed Allied that if it is unable or unwilling to complete the entire project for the agreed-upon price of $720,115, then U.S. Steel would terminate the purchase order. (Ex. JX; Tr. 11/4/20 at 136:12-21.) Mr. Wilmunen recommended to Mr. Falkenhan that Change Order Request No. 4 was not a valid change order request because this was a lump-sum project and no additional scope of work had been added. (Tr. 11/17/20 at 73:14-22.) U.S. Steel denied Change Order Request No. 4. (Ex. 471.)

Allied spent approximately seven weeks on the Minntac project. (Tr. 11/10/20 at 54-55.) Allied's wrongful termination claim includes prorated amounts for Change Order Requests Nos. 1, 2 and 4. According to Allied, the amount of its claim was calculated as a lost profit calculation. Allied pro-rated the original contract balance and full change order amounts based on the amount of time it was on the job at Allied's historical margin of 32.7% on the balance of the work, which was completed by others after its termination. (Ex. 491(a).)[9] According to Allied, the pro-rated value of the work that it performed, plus its lost profits on the work it could not perform due to its termination, total $834,308.00. (Ex. 491a.; Tr. 11/16/20 at 62-63.)

---

[9] Mr. Anness reduced Mr. Ramun's initial calculation of a 40% lost profit margin for unperformed work to 32.7% based on comparable historical work. (Ex. 491a; Tr. Nov. 16, 2020 at 61-63.)

Allied also seeks recovery of the value of the scrap it removed while on the project as well as scrap removed by others after it was terminated. Mr. Lindquist calculated the amount of scrap to which Allied claims to be entitled if it had stayed on the project for the full sixteen weeks. (Tr. 11/13/20 at 32-33.) Mr. Lindquist calculated some of the weights directly from U.S. Steel's drawings, which show the weights in detail. (Tr. 11/10/20 at 58, 62.) He also estimated some of the scrap amounts based on photos that depict scrap removed by Allied that were taken by Allied employee Ringo Willoughby (*Id.* at 69-71; Tr. 11/13/20 at 40-41; Ex. 499, at Bates No. 44847-95.) Mr. Willoughby also counted the scrap generated and informed Mr. Lindquist of his estimates in a phone call. Mr. Willoughby did not testify nor did Allied present any evidence regarding Mr. Willoughby's experience in estimating scrap amounts. Mr. Lindquist testified that he is not sure which lines Allied had removed, and many of the lines that Allied had worked on were not completely dismantled when it left the project. (Ex. 491 at USS_0004429; Tr. 11/13/20 at 36-37, 39-40.)

Mr. Lindquist's summary spreadsheets document the weights that he used for his scrap calculation. (Tr. 11/10/20 at 60-68; Ex. 499, at Bates No. 21294-21305.)

Mr. Ramun testified as to the rates he used to calculate the scrap value. Plate and structural scrap pricing was based on the price at which U.S. Steel had agreed to purchase scrap from Allied during the applicable time period, minus a $10.00 per gross ton freight charge pursuant to the 2010 DSA. (*See* Tr. 11/3/20 at 145-47; Ex. 7 at Attachment 8.) For stainless steel scrap, Allied used $1.00, because Allied would store all stainless-steel scrap it generated on its projects at its Youngstown facility until the stainless-steel market hit $1.00, at which time Allied would sell the scrap at that price. (Tr. 11/3/20 at 147-48.) Allied used the same rationale for using $0.40 per

pound for motors. (*Id.*) The total amount of the scrap value claimed as damages by Allied is $564,355.00. (Ex. 491a.; Tr. 11/16/20 at 62-63.)

In Exhibit 491a, which summarizes Allied's Minntac claim, the "Allied Scrap" category represents estimated scrap that Allied generated while working at Minntac. The "Scrap Removed by Others" is the scrap that Allied asserts was generated after Allied left the project. The costs that Allied would have incurred in removing that scrap are not factored into its calculation. (Tr. 11/13/20 at 37.)

The total of the scrap value of $564,355.00 plus pro-rated value of work of $834,308.00 equals $1,398,663.00 (Ex. 491a.) After the deduction of U.S. Steel's contemporaneous payment of $319,582 to Allied, its damage claim for Minntac is $1,079,081.00. (Exs. 491, 491a.; Tr. 11/3/20 at 142-49; Tr. 11/16/20 at 62-63.)

G. Unpaid Invoices (Count IV)

In Count IV of the Complaint, Allied seeks damages related to invoices issued to U.S. Steel that have not been paid. These invoices relate to three projects: (1) the C3 Furnace at Great Lakes Plant; (2) the Open Hearth Structural Failure at the Gary Plant; and (3) the Great Lakes Plaint #2 Coke Battery Screening Station.

**1. Great Lakes**

On April 15, 2013, Allied issued an invoice to U.S. Steel in the amount of $240,388.24 representing its contract balance for the C3 Furnace project. (Ex. 518.) U.S. Steel failed to pay this invoice based on its position that Allied did not complete the full scope of agreed-upon work. (Tr. 11/3/20 at 172; Tr.11/5/20 at 51, 52.) Article 5.1 of the 2003 Blanket Agreement permits U.S. Steel to withhold and retain monies otherwise due to Allied if Allied fails to perform the full scope of work. (Ex. D at Art. 5.1.)

On November 19, 2004, Allied submitted a proposal to U.S. Steel to demolish a number of structures at the U.S. Steel Great Lakes Zug Island facility, including the C3 Furnace. (Ex. 507.) Mr. Ramun and Mr. Lindquist, who attended the bid meetings on behalf of Allied, were instructed by U.S. Steel not to price any concrete removal or foundation removal. (Tr. 11/3/20 at 156-57; Ex. 508.) Mr. Lindquist was also told by a representative of U.S. Steel that no concrete removal was required. (Tr. 11/10/20 at 83.) Allied was advised by U.S. Steel that it should only bid structure removal. (Tr. 11/10/20 at 81-83.)

U.S. Steel issued a purchase order to Allied for the demolition of the C3 Furnace on August 3, 2005, for the sum of $4,807,753.00. (Ex. 509.) The purchase order did not reference any concrete or foundation removal. The project was placed on hold for a substantial period of time and was not completed until 2013. (Tr. 11/3/20 at 160-61.)

On February 1, 2013, Paul Falkenhan of U.S. Steel advised Allied by email that the C3 Furnace project was not complete until the foundation was removed. (Ex. 515 at 1.) He attached a 2008 schedule that included foundation removal as a line item. (Ex. 515 at 2.) U.S. Steel claimed that Allied created this schedule, which reflected that foundation removal was part of Allied's scope of work. (*Id.* at 3.)

The project schedule at issue is dated October 10, 2008 and entitled "Allied Erecting & Dismantling Co., Inc. C-3 Blast Furnace Schedule." (Ex. MH at USS_0007627; Tr. 11/5/20 at 57.) It includes a project schedule item entitled "Demo furnace hearth - iron skull." (Ex. MH at USS_0007627; Tr. 11/5/20 at 57-58.) The project schedule was made using "Primavera Systems." (Ex. MH at USS_0007627; Tr. 11/5/20 at 58.) Allied owned Primavera software in 2008. (Tr. 11/5/20 at 58.) Allied used Primavera software for at least one U.S. Steel project. (Tr. 11/13/20 at 45-46.)

Allied's original proposal in 2004 only included structural removal. (Ex. 516.) Before Mr. Faulkenhan's 2013 communication, the parties' only discussion about foundation removal in connection with this project was during a December 2005 meeting as part of a change order that would be issued to Allied. (Tr. 11/10/20 at 85.) U.S. Steel decided not to proceed with this extra work. (Ex. 516.)

Both Mr. Ramun and Mr. Lindquist indicated that the 2008 Primavera Schedule was not created by Allied. (Ex. 516; Tr. 11/10/20 at 86-88.) Mr. Ramun testified that Allied did not use Primavera software; it used Microsoft Project software. (*Id.*; Tr. 11/3/20 at 164-65.) Allied's only schedule for the C3 Furnace Project was prepared using Microsoft Project and did not include or reference any concrete foundation removal. (Ex. 516.) Further, Allied would not have created a schedule in which the iron skull would be removed after the concrete removal because the iron skull must be removed first. (Tr. 11/10/20 at 86-88.)

On March 11, 2013, U.S. Steel responded to Allied, acknowledging that it was incorrect that the 2008 Primavera schedule had been created by Allied and requesting further documentation to support Allied's position. (Ex. 515 at 12.) Allied complied with this request on March 22, 2013, sending to U.S. Steel, among other things: the original November 19, 2004 proposal letter, the original Purchase Order, and Allied's meeting minutes and notes associated with the December 15, 2005 budgetary meeting where U.S. Steel requested budgetary numbers for the foundation removal. (*Id.* at 13; Tr. 11/3/20 at 171-72.) U.S. Steel did not dispute or address this issue in any contemporaneous correspondence. (Ex. 515; Ex. 519.)

U.S. Steel's contention that Allied failed to perform the entire scope of the work because it did not perform foundation removal as part of this project is not supported by the evidence

presented at trial. Allied completed the full scope of agreed-upon work. The contract balance is $240,388.24.

## 2. Gary Open Hearth Structural Failure

On September 27, 2013, in response to a PSD issued by U.S. Steel to remove damaged sections of an open hearth at the Gary Works, Allied submitted its proposal to perform this work. (Exs. 526-27.) U.S. Steel issued a purchase order to Allied the same day. This was a negotiated project, not a last look project. The PSD for this project was revised on September 30, 2013, indicating that all demobilization from the work site was to be completed twelve weeks after the purchase order was placed. (Ex. MS at USS_0007781; Tr. 11/5/20 at 59-60.) Allied completed the job in the fall of 2014 and was paid for the scope of its work. (Ex. 526; Tr. 11/3/20 at 178; Tr. 11/13/20 at 47.)

Allied had performed more than 100 projects at the Gary site for U.S. Steel since 2004. (Tr. 11/3/20 at 188-89.) Pursuant to the terms of the 2010 DSA, Allied was entitled to invoice U.S. Steel for its demobilization costs (and subsequent remobilization costs) for its equipment following each negotiated project at the Gary site. (*Id.* at 189; *see also* Ex. 7). At the same time, some of the Gary projects were last look projects for which Allied was not entitled to be paid for mobilization or demobilization. (Tr. 11/5/20 at 65; Tr. 11/10/20 at 161.)

Allied kept a fleet of equipment on site at Gary and only charged U.S. Steel for a single final demobilization from Gary after its final job. (Tr. 11/3/20 at 189-90.) When Allied demobilized from the Gary site in 2015, it demobilized equipment used not only on the Open Hearth project but also on all other projects at Gary. Allied billed all the demobilization costs for the other projects to the Open Hearth project. (Tr. 11/5/20 at 66.) Allied submitted five invoices

to U.S. Steel between April and October of 2015 for the Gary demobilization that total $220,177.00. (Ex. 533.) Allied was not paid by U.S. Steel for these five invoices.

### 3. Great Lakes #2 Coke Battery Screening Station

On July 8, 2015, after Allied performed dismantling work at U.S. Steel's #2 Coke Battery Screening Station, it submitted its final invoice in the amount of $218,000.00. U.S. Steel employee Christine Breves sent Allied a letter on August 6, 2015, advising it of U.S. Steel's intention to offset current and future amounts owed to Allied against the amounts Allied owed to U.S. Steel as a result of the judgment it obtained in the 2012 Litigation. (Ex. NC; Tr. 11/5/20 at 47-48.) U.S. Steel later offset from its bankruptcy proof of claim the contract price for the Coke Battery Screening Station. (Tr. 11/5/20 at 48-49.) Allied is not seeking damages related to this offset.

In addition to its final invoice, Allied also invoiced U.S. Steel for various scrap purchased by U.S. Steel from Allied on the project. These invoices are summarized in Exhibit 536 and in Mr. Anness's report at Attachments F, F-1, F-2, and F-3. U.S. Steel did not pay Allied for these scrap purchase invoices nor were they included as part of its set off in the bankruptcy. Allied identified the scrap purchases that U.S. Steel did not pay or set off in its accounting records for the project. (Ex. 536.) U.S. Steel did not offer any contrary evidence. These invoices total $28,412.00.

### H. Fairless Claim (Count V)

Allied claims that U.S. Steel breached the parties' agreements by prohibiting it from completing its dismantling work at the Fairless Works project site ("Fairless") and removing scrap owned by Allied after it was locked out by U.S. Steel on December 31, 2013. Allied claims as damages the value of the scrap that was left at the Fairless site.

Allied started working at Fairless in the 1990's and its work at its facilities continued for most of the 1990's. Allied's work at the Cold End of Fairless started after the execution of the 2003 AIP. (Tr. 11/4/20 at 10-12.) As provided in the 2003 AIP, Allied received an advance of $7 million from U.S. Steel and was guaranteed a $7 million profit margin. (Ex. 3 ¶ II(B)(1).) The 2003 AIP provided a method for accounting for the revenues generated in the dismantling projects, including those at Fairless. (Ex. 3 ¶¶ II(A), II(B)(1)(2).) Pursuant to Section 5.2 of the FCS, Allied owned, inter alia, "each facility to be dismantled;" "all ferrous and nonferrous scrap resulting from the dismantling work;" "all ferrous and nonferrous scrap located within each dismantling area;" and "railroad track located within a specific dismantling area which exclusively serves that dismantling area." (Ex. 2 at 53; *see also* Ex. 3 ¶ II(B)(7) (providing for Allied's ownership of scrap).) Prior to this controversy, the vast majority of the ferrous scrap generated was purchased by U.S. Steel. (Ex. 3 at 6; Tr. 11/4/20 at 12-13.)

Section 3 of the FCS provided that "[w]ork on each phase of the work shall be completed within three years after U.S. Steel has authorized [Allied] to begin work on that phase." The next sentence states that Allied had "an additional twelve (12) months to remove all accumulated scrap from the site." (Ex. 3 § III.)

Mr. Lindquist oversaw the Fairless project, visited the site twice a month and was in regular communication with the on-site superintendent. (Tr. 11/10/20 at 88-89.)

Starting in May of 2012, the parties exchanged a series of letters regarding U.S. Steel's requests for Allied to complete its work, remove all scrap and demobilize from Fairless by December 31, 2013. (Ex. NN; Tr. 11/5/20 at 120; Ex. NX; Ex. 546.) These communications reference various disagreements between the parties as to their rights and obligations. In a letter directed to U.S. Steel dated June 22, 2012, Allied objected that U.S. Steel had not yet made

51

available to Allied the railroad track related to dismantled facilities at the Sheet and Tin facility, nor had it made available to Allied the nonferrous scrap associated with the underground and above ground utility systems, and that it could not provide a schedule until U.S. Steel defined the scope of all of the remaining work at Fairless. (Ex. 546.)

In a letter sent in May 2013, U.S. Steel asked Allied to submit deadlines for completion of certain matters and to remove its scrap. (Ex. OM.) The identified items were the same as set forth in letters sent by U.S. Steel in 2012. (Ex. NN; Ex. NX.) U.S. Steel sent Allied another letter on October 31, 2013, attaching a list of Allied's completed demolition work at Fairless and identifying the work that remained to be completed. (Ex. 565.) This updated list as to remaining work included "remove existing scrap on ground, from current demolition projects." (*Id.*) U.S. Steel demanded that Allied demobilize from Fairless by December 31, 2013. (*Id.*) U.S. Steel also notified Allied in the same letter that it would be providing a PSD for an additional project to remove parts and equipment from the former Sheet and Tin machine shop at Fairless. (*Id.*) U.S. Steel sent that PSD to Allied on November 4, 2013 (Ex. 566), and subsequently issued a Purchase Order to Allied for this work on December 19, 2013, eleven days before the date by which U.S. Steel had demanded Allied to demobilize. (Ex. 570.)

Allied responded to U.S. Steel's letter on December 16, 2013, informing U.S. Steel that it would require 3 to 4 months to complete its current work at Fairless, and reasserting its position that the items listed in U.S. Steel's October 31, 2013 letter were not the full extent of the work Allied was entitled to perform at Fairless pursuant to the FCS. (Ex. 569.) According to Mr. Lindquist, two months was not enough time to finish Allied's work at Fairless. (Tr. 11/10/20 at 108-09.)

As directed by U.S. Steel, however, Allied departed from Fairless on December 31, 2013 (Tr. 11/19/20 at 6:25-7:2.) U.S. Steel had made multiple demands that Allied remove the scrap by that time but Allied took the position that it was given insufficient time to do so. (Ex. OM; Ex. OR; Ex. 575; Tr. 11/5/20 at 124.)

Mr. Lindquist testified that the majority of the scrap still on site at the end of 2013 had been generated in 2013, including all structural scrap, tin, rubber-coated rolls, and alloy rolls. (Tr. 11/13/20 at 55-57.) Allied did not weigh any of the scrap remaining on the Fairless site when it left at the end of 2013. (Tr. 11/5/20 at 126.) Its calculation of the scrap left behind at Fairless is based on a visual estimate conducted by Mr. Lindquist in December of 2013. (Tr. 11/10/20 at 115, 118; Tr. 11/13/20 at 48, 53; Tr. 11/19/20 at 16-17.) During his visit to the Fairless site in December 2013, Mr. Lindquist estimated the remaining scrap, structures and material at Fairless that Allied claimed as its property. (Tr. 11/10/20 at 113-17.) He did so by visually inspecting the piles and materials and estimating the weights. (Tr. 11/10/20 at 114-18.) This is the same method he used with respect to other U.S. Steel projects. (*Id.*)

In a January 24, 2014 letter, U.S. Steel informed Allied that it would be permitted to reenter the Fairless site, but only to collect its equipment and not "for any processing or shipment of scrap." (Ex. 576.) The scrap could have been removed at the same time that the equipment was being removed. (Tr. 11/10/20 at 131.) At a subsequent meeting between the parties on February 11, 2014, Allied requested the opportunity to remove the scrap but U.S. Steel refused. (Ex. 595; Tr. 11/10/20 at 126-131.) Allied objected in a letter dated May 29, 2014, to U.S. Steel's contention that Allied had abandoned its scrap. (Ex. 584.) Allied removed all of its equipment from Fairless by June 10, 2014. (Ex. 585.)

Mr. Lindquist visited Fairless on May 29, 2014. (Ex. 594; Tr. 11/10/20 at 128.) At that time, he took pictures of the scrap left at the site and the remaining structures and property Allied contended it was not allowed to remove. (Ex. 595; Tr. 11/10/20 at 131-34.)

Bill Lamb, a U.S. Steel employee, was responsible for demolition activities at Fairless. (Tr. 11/19/20 at 5-6.) He testified that he identified all scrap that was on the site after Allied departed and determined that all of it was either in the Raw Coil Storage Building or the Field South of Building 230. (Tr. 11/19/20 at 17.)

According to Mr. Lamb, U.S. Steel solicited bids from various scrap processors with respect to the Raw Coil Storage Building and awarded the job to Sims Metal Management ("Sims"). (Tr. 11/19/20 at 9.) However, Mr. Lamb had no first-hand knowledge about any bidding process nor was any evidence presented regarding the solicitation of bids. (*Id.* at 23.) Sims' invoices state that it purchased approximately 2.3 gross tons of scrap for the price of $501,082.90. (Tr. 11/19/20 at 9-12.) Sims listed the scrap it purchased, including the weights of the loads and the price per gross ton that it paid. (Ex. PP at USS_0008147.) Sims removed this scrap in November 2014. (*Id.*) U.S. Steel also sold scrap located at the Field South of Building 230 to Sims without a bid. (Tr. 11/19/20 at 12.) This scrap, which was removed in September 2015, was sold for $12,914.59. Sims generated a document that reflected the weight and price of the scrap. (Tr. 11/19/20 at 12-13; Ex. PT at USS_0008191.) None of this scrap was weighed by U.S. Steel on site and no one from Sims testified at trial regarding the process by which it removed or weighed the material. (Tr. 11/19/20 at 24.)

At trial, Mr. Lindquist described the photographs that documented the remaining structures, property, and scrap materials remaining at Fairless as of December 2013. (Ex. 595; Tr. 11/10/20 at 131-34.) Mr. Lindquist also compared a U.S. Steel document showing two of the scrap

piles it said it shipped (Ex. 593) to the list of remaining scrap at Fairless prepared by Allied (Ex. 575) and disputed that the summary prepared by Mr. Lamb covers all of the areas and materials listed on Ex. 575.  (Tr. 11/10/20 at 119-126.)

Allied seeks $1,387,475.00 in lost profit damages for the scrap withheld by U.S. Steel. These damages were calculated by Mr. Anness by using the estimated weights supplied by Mr. Lindquist and prices of $367 GT for bailed sheets and $396 GT for plate and structural scrap. These prices are consistent with those reflected in contemporaneous purchase orders that were paid to Allied by U.S. Steel for scrap it purchased from Allied at Fairless.  (Ex. 572; Ex. 573.)

## IV.    Conclusions of Law

Allied asserts various breach of contract claims against U.S. Steel.  "A federal court sitting in diversity must apply state substantive law and federal procedural law."  *Chamberlain v. Giampapa*, 210 F.3d 154, 158 (3d Cir. 2000) (citation omitted).  Here, the parties do not dispute that the contracts at issue must be interpreted under Pennsylvania law.

Under Pennsylvania law, a party must establish three elements to prove a breach of contract claim: "(i) the existence of a contract, including its essential terms; (ii) a breach of the contract; and (iii) resultant damages."  *Kelly v. Carman Corp.*, 229 A.3d 634, 653 (Pa. Super. Ct. 2020) (quoting *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016)).

Damages must be calculated to a "reasonable certainty" with doubts construed against the breaching party. *ATACS Corp. v. Trans World Commc'ns*, 155 F.3d 659, 669 (3d Cir. 1998) (citing *Scobell, Inc. v. Schade*, 668 A.2d 715, 719 (Pa. Super. Ct. 1997)). That includes damages based on lost profits.  *See Nat'l Controls Corp. v. Nat'l Semiconductor Corp.,* 833 F.2d 491, 495 (3d Cir. 1987); *Gen. Dynafab, Inc. v. Chelsea Indus., Inc.,* 447 A. 2d 958, 960 (Pa. Super. 1982).

Reasonable certainty is not mathematical certainty, but "[a]t a minimum," requires a "rough calculation that is not 'too speculative, vague or contingent' upon some unknown factor." *ATACS Corp.*, 155 F.3d at 669 (quoting *Spang & Co. v. United States Steel Corp.*, 545 A.2d 861, 866 (Pa. 1988)); *see also Ware v. Rodale Press, Inc.*, 322 F.3d 218, 226 (3d Cir. 2003) (applying Pennsylvania law). "The plaintiff must introduce sufficient facts upon which the [factfinder] can determine the amount of damages without conjecture." *Welding Engineers Ltd. v. NFM/Welding Engineers, Inc.*, 352 F. Supp. 3d 416, 434 (E.D. Pa. 2018). As the plaintiff, Allied had a duty to mitigate its damages upon any breach of the contract by U.S. Steel. *See, e.g.*, *Aircraft Guar. Corp. v. Strato-Lift, Inc.*, 991 F. Supp. 735, 738 (E.D. Pa. 1998) (collecting cases).

The 2010 DSA is a valid, binding, and enforceable contract that was entered into between Allied and U.S. Steel on February 11, 2010 and was in full force and effect until December 31, 2015. The 2010 DSA is an unambiguous, fully integrated written agreement. (Ex. G § 4(F).) The 2010 DSA incorporates the 2003 Blanket Agreement. The 2003 Blanket Agreement applies to all work performed under the 2010 DSA. (Ex. G § 4(A).) The 2003 Blanket Agreement is a valid, binding, and enforceable contract entered into between Allied and U.S. Steel on November 18, 2003 and was in full force and effect until March 31, 2014. Further, the 1992 Final Conformed Specification is a valid, binding, and enforceable contract entered into between Allied and U.S. Steel on September 11, 1992. The 2003 AIP, which was executed on November 17, 2003, is a valid, binding, and enforceable contract entered into between Allied and U.S. Steel. The 2004 AIP, which was effective on November 18, 2003, is a valid, binding, and enforceable contract entered into between Allied and U.S. Steel

The Pennsylvania Supreme Court has held that:

[W]hen a written contract is clear and unequivocal, its meaning must be determined by its contents alone. It speaks for itself and a meaning cannot be given to it other

than that expressed. Where the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence. Hence, where language is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as *manifestly expressed*, rather than as, perhaps, silently intended.

*Lesko v. Frankford Hosp.-Bucks Cty.*, 15 A.3d 337, 342 (Pa. 2011) (citing *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982) (emphasis original)). A clear and unambiguous contract is construed as a matter of law. *Trizechahn Gateway, LLC v. Titus*, 976 A.2d 474, 483 (Pa. 2009). Here, neither party contends that the relevant contracts are ambiguous, and the Court similarly concludes that they are unambiguous.

"Parties have the right to make their own contract, and it is not the function of the court to rewrite it or give it a construction in conflict with the plain meaning of the language used." *Dep't of Transp. V. Acchioni & Canuso, Inc.*, 324 A.2d 828, 830 (Pa. Cmwlth. 1974). Further, "courts are not generally available to. . . make up special provisions for parties who fail to anticipate foreseeable problems." *Wert v. Manorcare of Carlisle PA, LLC*, 124 A.3d 1248, 1260 (Pa. 2015) (citation omitted). "Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed." *Murphy v. Duquesne Univ. Of The Holy Ghost*, 777 A.2d 418, 429 (2001) (citing *Steuart*, 444 A.2d at 662).

In determining the intent of the parties, a court must review and give effect to all of the provisions of a contract and employ the plain meaning of its language. *See, e.g.*, *TruServ Corp.*, 39 A.3d, at 260. "[W]hen the language of a contract is clear and unequivocal, courts interpret its meaning by its content alone, within the four corners of the document," and "this Court need only examine the writing itself to give effect to the parties' understanding. [We] must construe the contract only as written and may not modify the plain meaning under the guise of interpretation."

*Dressler Fam., LP v. PennEnergy Res., LLC*, 276 A.3d 729 (Pa. Super. Ct. 2022), *reargument denied*, (July 6, 2022) (citation omitted).

## A. Count I

### 1. Failure to provide complete bid

The 2010 DSA requires U.S. Steel to provide Allied with the "most acceptable bid." This term is clear and unambiguous and required U.S. Steel to give Allied the whole bid. Until sometime in 2014, U.S. Steel complied with this provision, reflecting its understanding of the meaning of this term. This is also consistent with the parties' prior agreement in the 2003 Dismantling Agreement that U.S. Steel would provide Allied with the "actual bid."

The evidence at trial demonstrated that Allied performed certain projects without receiving the full bid from U.S. Steel. These projects are not at issue here, however, and there is no evidence in the record about why Allied may have agreed to do so.

U.S. Steel relies on the testimony of Allied's representatives that Allied was not required to perform the work in the same manner as set forth in the most acceptable bid as long as it matched the price and schedule. Thus, it argues, that Allied's course of performance at the last look and performance stage shows that Allied was required to match only the material terms of the most acceptable bid, and that that the material terms are price and schedule.

Under Pennsylvania law, course of performance is "a sequence of conduct between the parties subsequent to formation of the contract during performance of the terms of the contract." *J.W.S. Delavau, Inc. v. E. Am. Transp. & Warehousing, Inc.*, 810 A.2d 672, 683-84 (Pa. Super. Ct. 2002). It may only be used to interpret a contract. *Id.* (citing *Matthews v. Unisource Worldwide, Inc.*, 748 A.2d 219 (Pa. Super. Ct. 2000)). "[W]here the course of performance contradicts the unambiguous language of the contract, the court should not allow the course of performance to

58

supersede the language of the contract." *Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*, 561 F.Supp. 3d 467, 480 (M.D. Pa. 2021).

In the 2010 DSA, the parties clearly and unambiguously agreed that "[n]o...course of performance...purporting to modify, vary, supplement or explain any provision of this Agreement shall be effective unless in a writing prepared for such purpose" and signed by representatives of both parties. (Ex. 7 § 4(F)). No such writing was offered at trial. Thus, the parties' course of performance cannot supersede or modify U.S. Steel's obligation to provide the complete most acceptable bid to Allied so that it could determine whether to exercise its last look rights.

U.S. Steel alternatively argues that Allied's failure to perform its work in compliance with all of the terms of the most acceptable bid was a material breach of the 2010 DSA that precludes Allied from enforcing the agreement as it relates to these projects.[10] "Although any contractual default may be considered a breach, it is only when the breach constitutes a material failure that the nonbreaching party is discharged from all further obligations under the contract and is free to terminate the contract." *Tyro Indus., Inc. v. Trevose Const. Co.*, 737 F. Supp. 856, 864 (E.D. Pa. 1990). *See* Restatement (Second) of Contracts §§ 235(a), 237. In determining whether a failure of performance is material, courts consider the following factors:

> a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
> b) the extent to which the injured party can be adequately compensated for that part of that benefit of which he will be deprived;
> c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
> d) the likelihood that the party failing to perform or offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

---

[10] It is worth noting that U.S. Steel takes the position in its Proposed Findings of Fact that Allied was "permitted to perform. . . every project any way it wished." (Proposed Findings of Fact ¶ 165.)

e) the extent to which the behavior of the party failing to perform or offer to perform comports with standards of good faith and fair dealing.

*Oak Ridge Const. Co. v. Tolley*, 504 A.2d 1343, 1348 (Pa. Super. Ct. 1985) (quoting Restatement (Second) of Contracts § 241). These factors are "to be applied in light of the facts of each case in such a way as to further the purpose of securing for each party his expectation of an exchange of performances." Restatement (Second) of Contracts § 241 cmt. a. No single factor is dispositive. *Norfolk So. Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 92 (3d Cir. 2008).

With respect to completed last look projects performed by Allied, there is no evidence that U.S. Steel, whose representatives were onsite on these projects, objected to or took any other action when Allied did not follow all of the terms of the most acceptable bid or performed the project in a different manner than contemplated by the most acceptable bidder. Further, there is no evidence that U.S. Steel did not receive the benefit of its bargain with respect to these projects, declined to compensate Allied despite some deviation from the most acceptable bid or otherwise took the position at the time that this represented a material breach. Without some evidence that Allied's conduct did not adequately perform its duties, U.S. Steel's assertion that Allied materially breached its obligations in completing last look projects without matching all terms in the most acceptable bid is unavailing. Thus, there is no material breach that bars Allied from seeking recovery with respect to the Count I projects.

Therefore, U.S. Steel breached the 2010 DSA by failing to provide Allied with the entire bid from the most acceptable bidder with respect to the following projects: Great Lakes/Zug Island Sulfate Building (Phase 4, Part B); Granite City Baghouse Platform; Port Perry COG Pipeline Removal; and Clairton C-3064 Flushing Liquor Surge Tank. Allied properly declined to exercise its last look rights because of U.S. Steel's breach and therefore, could not exercise its last look rights. Excluding interest, Allied is entitled to the following damages:

- Great Lakes/Zug Island Sulfate Building (Phase 4, Part B): $120,356.00
- Granite City Baghouse Platform: $13,966.00
- Port Perry COG Pipeline Removal: $77.609.00
- Clairton C-3064 Flushing Liquor Surge Tank: $19,420.00

## 2. Wrongful cancellation

a. *Dust Storage Silo at Granite City, No. 2 Boiler House Coke Oven Gas Line and Removal at Gary and Fairfield QBOP Area Demo*

Pursuant to Section 3(A) of the 2010 DSA, U.S. Steel was not obligated to perform any Dismantling Work (as defined in the DSA) or to award Allied any specific volume of work. (Ex. G § 3(A). These provisions do not relate to U.S. Steel's right to cancel *after* it has notified Allied of its intent to proceed with a dismantling project. The 2010 DSA addresses this issue as to negotiated projects by providing that U.S. Steel may cancel or postpone a project if the parties cannot agree on a price. (Ex. 7 § 3(E).) Notably, however, the 2010 DSA does not address the parties' rights or duties when U.S. Steel terminates a project after Allied has exercised its last look rights. Thus, the Court must determine whether U.S. Steel is contractually bound to proceed with a project, or alternatively, must compensate Allied if it fails to proceed once Allied has exercised its last look rights.

As reflected in the 2010 DSA, the parties were aware of and considered the issue of U.S. Steel's right to terminate a dismantling project. They expressly agreed that U.S. Steel had the right to cancel a negotiated project. They included no such a right with respect to last look projects, nor can one be inferred. Given the fractious nature of the parties' relationship, it is possible to envision circumstances in which U.S. Steel could unilaterally cancel a specific project simply because it did not want to work with Allied. That is directly contrary to the agreement of the parties that Allied could perform all of U.S. Steel's dismantling work. While there was no evidence that U.S. Steel cancelled these projects in bad faith, the contract provides no right

61

to terminate a last look project that has been accepted by Allied, and the Court cannot add a term to which the parties did not agree. *Dep't of Transp. v. Acchioni & Canuso, Inc.*, 324 A.2d 828, 830 (Pa. Cmwlth. 1974).

At the same time, however, Allied has failed to prove damages. While it is undisputed that these projects did not proceed with Allied, it is also the case that U.S. Steel did not award them to another contractor and the facilities were not dismantled. Further, Allied did not present any evidence that it lost other projects or incurred costs in anticipation of the cancelled projects as a result of U.S. Steel's actions. Thus, Allied did not sustain any damages as a result of U.S. Steel's breach and therefore cannot prevail its breach of contract claims relating to the Dust Storage Silo at Granite City and No. 2 Boiler House Coke Oven Gas Line and Removal at Gary.

With respect to the Fairfield QBOP Area Demo project, U.S. Steel competitively bid this project but later advised all bidders that it decided to use plant labor to perform this work. As U.S. Steel concedes, however, there was no collective bargaining agreement that required its plant labor forces to perform the QBOP Area Demolition at Fairfield project. Had there been such an agreement, U.S. Steel was not required to offer last look rights to Allied. (Ex. 7 § 3(R).) Under these circumstances, U.S. Steel breached the 2010 DSA by failing to offer Allied last look rights. However, as discussed above, Allied failed to prove that it sustained damages as a result. Therefore, Allied will not be awarded any damages with respect to this project.

> b. *Great Lakes/Zug Island Crusher Screening Building and Conveyor Junction House*

U.S. Steel cancelled the purchase order issued to Allied because Allied requested additional compensation for separation work that was not included in the PSDs and then asked the most acceptable bidder to modify its work plan and clarify its bid to include this additional work. By doing so, U.S. Steel breached the 2010 DSA by failing to abide by the terms of the original bid,

refusing to issue a change order, and subsequently cancelling the project with Allied. (Ex. 7 § 3(E).) U.S. Steel was also in breach of the 2010 DSA by communicating with the most acceptable bidder. (Ex, 7 § 3(F).) Allied is entitled to damages of $276,015.00 exclusive of interest.

### 3. Improper negotiations

Although U.S. Steel breached Section 3(F) of the 2010 DSA, which requires that competitive bids be "limited to the work specified and must be consistent with, and pursuant to, the work described in the invitation to bid," with respect to the Granite City Blooming Mills Stacks project by communicating with the most acceptable bidder after receipt of their initial bid and changing the scope of work set forth in the PSD, Allied did not sustain any damages as a result. It was on notice that certain work was no longer necessary, performed and completed the work as modified and was compensated for the required work. Thus, its claim cannot be sustained.

### 4. Setoff

Allied seeks recovery for certain Count I projects it did not perform because U.S. Steel declared its intention to offset amounts that otherwise would be due to Allied for its work against upon the $10.6 million judgment U.S. Steel obtained from Allied in the 2012 Litigation.

Pursuant to the clear and unambiguous language of Article 5.1 of the 2003 Blanket Agreement, which was incorporated into the 2010 DSA, U.S. Steel is entitled to offset any obligations it is owed from Allied arising from any claim that U.S. Steel has against Allied and any obligation that Allied owes U.S. Steel. Article 5.1 permits offset as payment for the breach of any contract entered into during the term of the 2003 Blanket Agreement, which by its terms was in effect from November 18, 2003 until March 31, 2014. U.S. Steel's judgment in the 2012 Litigation related to the breach of the 2004 AIP, which was executed on April 5, 2004. Thus, U.S.

Steel's claim and subsequent judgment arose as a result of the breach of a contract entered into during the term of the 2003 Blanket Agreement.

Moreover, by its terms, the 2003 Blanket Agreement does not require that a claim or obligation be reduced to a final judgment in order for U.S. Steel to exercise its right of offset. Thus, the fact that U.S. Steel's August 6, 2015 notice to Allied of its intent to offset amounts that was or would be otherwise due to Allied under already completed or yet to be completed projects was given prior to the entry of final judgment on September 25, 2015 is irrelevant. As of June 4, 2015, U.S. Steel had a contractual right to offset payments that would otherwise be owed to Allied. Therefore, Allied has failed to meet its burden to demonstrate a breach of contract with respect to the following: the Clairton T62 Light Oil Tank project; the Great Lakes #2 Byproducts Scrubbers project; the Clairton Screening Station Removal project; and the Edgar Thompson Slag Processing Roof Sheeting project.

## B. Count II

U.S. Steel breached the 2010 DSA by refusing to provide Allied its "last look" rights for the railcar and barge work delineated in the updated Transtar spreadsheet prepared by U.S. Steel. (Ex. 653.) U.S. Steel's breach of Allied's "last look" rights regarding the additional railcar and barges directly and proximately caused Allied to incur lost profit damages in the amount of $915,314.00, excluding interest, as summarized in Exhibits F, F1, F2, and F3 of the Anness Report (Ex. 14 and 14(a)).

## C. Count III

In the Report and Recommendation (ECF No. 66) regarding U.S. Steel's motion to dismiss that was issued by Magistrate Judge Mitchell and later adopted by Judge Cercone, the Court held that issue preclusion barred Allied from relitigating a ruling in the 2012 Litigation that the 2010

DSA requires written change orders. That is the law of the case. Moreover, the bid packages submitted by U.S. Steel uniformly stated that: "Change orders will not be granted unless [U.S. Steel] requests a change in project scope, methods, schedules, or dismantling plans. Change Orders must be approved, with a proper [purchase order] Revision document, prior to performing any additional work." (*See, e.g.*, Ex. LR at AED_001683; Ex. LC at AED_006264; Tr. 11/5/20 at 26.)

At the same time, however, as explained in a subsequent opinion (ECF No. 121) in connection with U.S. Steel's motion for summary judgment, the Court also held that Allied may be excused from this contractual requirement if U.S. Steel engaged in conduct that delayed or prevented Allied's work. (ECF No. 121 at 19; *see also* ECF No. 66 at 13-14.) *See James Corp. v. N. Allegheny Sch. Dist.*, 938 A.2d 474, 484 (Pa. Cmwlth. 2007); *Coatesville Contractors & Eng'rs, Inc. v. Borough of Ridley Park*, 506 A.2d 862, 865 (1986). As noted in *James Corporation v. North Allegheny School. District*:

> Pennsylvania law recognizes [that] exculpatory provisions in a contract cannot be raised as a defense where (1) there is an affirmative or positive interference by the owner with the contractor's work, or (2) there is a failure on the part of the owner to act on some essential manner necessary to the prosecution of the work.

938 A.2d, at 484.

As stated by the Pennsylvania Supreme Court, ". . . it should be obvious that when an owner requests a builder to do extra work, promises to pay for it and watches it performed knowing that it is not authorized in writing, he cannot refuse to pay on the ground that there was no written change order." *Universal Builders, Inc. v. Moon Motor Lodge, Inc.*, 430 Pa. 550, 560 (1968). There is an implied duty of good faith and fair dealing in the performance and enforcement of the contract found in every contract. *See Giant Food Stores, LLC v. THF Siler Spring Dev., L.P.*, 959 A.2d 438, 447-48 (Pa. Super. 2008), *appeal denied*, 972 A.2d 522 (2009) (citation omitted).

Thus, the Count III claims must be determined by assessing whether in the absence of a change order, U.S. Steel engaged in conduct that delayed or prevented Allied's work.

### 1. Great Lakes Sulphate Building

With respect to Change Order Request No. 1, Allied seeks, among other things, damages for idled equipment. While it was undisputed that it was not feasible to redeploy the equipment under the circumstances, Allied failed to show that it required the equipment elsewhere and sustained damages as a result or for that matter, sustained any damages because its equipment sat idle. Accordingly, it is not entitled to any damages related to idle equipment. On the other hand, it has shown that it is entitled to damages of $9,788.64 for the cost of remobilizing a new crew as a result of the delay caused by U.S. Steel and the value of the scrap improperly removed by U.S. Steel in the amount of $4,857.00 and will be awarded a total of $14,645.64, exclusive of interest.

Change Order Request No. 2 requests the sum of $55,904.00 for the use of a crane and additional laborers to lift down the structural steel at the west end of the structure. U.S. Steel did not request a change in the dismantling method nor did it direct Allied to complete work outside the scope of the project or engage in any conduct that delayed or prevented Allied's work. Further, the testimony at trial presented by Allied was that it could perform the work in the best way that it determined and was not required to perform the work using the method in the most acceptable bid. Thus, Allied is not entitled to recover the sum of $55,904.00 as set forth in Change Order Request No. 2.

### 2. Great Lakes Ore Dock Trestle

Allied's claim clearly relates to the extra time and labor caused by U.S. Steel's inability to purge all of the coke oven gas and its contractor's inability to cut the line as anticipated. Thus, U.S. Steel engaged in conduct that delayed Allied's work. However, Allied failed to prove its

damages with reasonable certainty because the CDRs in evidence, on which Mr. Lindquist testified he relied to calculate the claimed extra time and labor, do not support this claim.

### 3. Great Lakes 36 Inch COG Line Removal

Allied's claim in its two change order requests that relate to the use of a third crane are requests for additional compensation for work within the scope of the work it agreed to perform. U.S. Steel did not change the scope of the work or the method by which Allied was directed to do its work. Moreover, as the Court previously ruled, U.S. Steel cannot be liable for claims based on weather delays. Therefore, Allied cannot recover damages for this project.

### 4. Great Lakes #2 Coke Battery Screening Station

Allied has asserted a claim for $576,279.00, $71,872.00 of which represents a loss of scrap value. While Allied presented sufficient evidence to show that the value of scrap declined during the delay in the start of the project, it failed to prove that U.S. Steel had a contractual obligation to issue a purchase order or commence this project within a specified time period. Therefore, Allied is not entitled to recover the loss of scrap value of $71,872.00.

The balance of the change order at issue, or $504,407.00, is claimed for various delays and changes in the work plan. U.S. Steel acknowledged in correspondence with Allied that the discovery of asbestos constituted a compensable delay, and the Court agrees. However, Allied's claimed damages include requests related to weather delays that are not recoverable and for the use of a replacement crane because it shipped the crane that was on site to Youngstown. Moreover, some of the CDRs on which Mr. Lindquist relied reflect that work on the project, albeit not "efficient work," was performed by Allied workers on days that are part of its delay claim. Having carefully reviewed Exhibits 349 and 352, the Court is unable to determine which of the claimed damage amounts may fall into these unsupported categories, or to calculate damages to which

Allied may be entitled. As such, the Court must conclude that Allied has not proven its damages with reasonable certainty and may not recover on its claim.

### 5. Gary #7 Blast Furnace Stockhouse Bins

Allied demonstrated, and U.S. Steel did not refute, that the plant operations that led to delays in the completion of its work were not normal operations within the 10% contingency referenced in the PSD. The amounts for Change Order Requests Nos. 1, 2 and 3 of $39,560.00, $18,340.00, and $28,132.00, respectively, are fair and reasonable compensation to Allied for the additional costs it incurred for extra manpower and equipment due to delays as a result of unforeseen plant operations necessarily caused by U.S. Steel. Thus, Allied is entitled to recover from U.S. Steel the additional costs it incurred for extra manpower and equipment based on unforeseen plant operations that were caused by U.S. Steel.

### 6. Minntac

U.S. Steel breached the parties' contract by wrongfully terminating Allied. While U.S. Steel put Allied on notice on April 28, 2014 that it could be terminated if it failed to satisfy the project requirements within three days, U.S. Steel's own documents and the testimony of its employees showed that Allied was on schedule when it was terminated a month later. Although Allied unquestionably had significant performance problems during the first two weeks of the project, schedule changes and delays by others also impacted Allied's progress. U.S. Steel terminated Allied, at least in part, because Allied "refused" to perform its work for the lump sum price for which Allied agreed to perform the project. However, while Allied did, in fact, submit change order requests that would have taken its compensation well beyond that lump sum, there is no evidence that it refused to continue its work unless U.S. Steel paid these change order requests.

At the same time, Allied did not meet its burden to prove some of the damages it is claiming. Change Order Request No. 1 sought additional compensation related to additional equipment and labor time Allied alleges it incurred based on U.S. Steel's direction to move the scrap processing area. Allied did not present evidence that the use of the equipment and labor time associated with this issue had any impact on the performance of its other work or caused it to incur additional costs as it was not required to hire an additional operator or utilize additional equipment. As a result, Allied has not demonstrated that it sustained any compensable damages. Therefore, it is not entitled to recover any damages associated with Change Order Request No. 1, and this portion of its claim is rejected.

Change Order Request No. 2 relates to claimed compensation for an additional week that U.S. Steel added to the project. The most acceptable bid was based on a project that was to take 16 weeks. It is reasonable to conclude that the most acceptable bid would have been higher if the project took an additional week. Moreover, the prorated profit of $14,717.00, as calculated by Mr. Anness, was proven with reasonable certainty. It is based on the value of the contract price per week and then calculated by using Allied's historical profit margin. Thus, Allied is entitled to recover $14,717.00.

Allied submitted Change Order Request No. 4 on May 21, 2014 for $519,801.00 regarding U.S. Steel's directive that Allied add a second shift each Monday and four additional workers for the remainder of each week of the job. While Allied correctly notes that the most acceptable bid was based on one crew, Allied was not required to use one crew and could have performed the job in whatever manner it determined was appropriate. Moreover, while U.S. Steel directed Allied to add a second shift and four additional workers, it did so because Allied fell behind in its work. It is also noteworthy that the amount claimed by Allied is more than two-thirds of the total amount

of the original lump sum price, and as such, is unreasonable. Therefore, Allied has not shown that it is entitled to recover the prorated amount of Change Order Request No. 4, and its claim of $519,801.00 is rejected.

Finally, with respect to the claim for the value of the scrap to which Allied was contractually entitled, Allied has proven its entitlement to $564,355.00. Although it was unable to weigh the scrap, Mr. Lindquist's calculation, based on his experience in doing so, and using both drawings with scrap weights and relying on photos and Mr. Willoughby's estimates, was sufficient to prove Allied's damages.

Therefore, Allied is entitled to recover damages against U.S. Steel in the amount of $579,072.00, exclusive of interest.

D. Unpaid Invoices (Count IV)

In Count IV of the Complaint, Allied seeks damages related to invoices issued to U.S. Steel that have not been paid. These invoices relate to three projects: (1) the C3 Furnace at Great Lakes Plant; (2) the Open Hearth Structural Failure at the Gary Plant; and (3) the Great Lakes Plaint #2 Coke Battery Screening Station.

**1. Great Lakes C3 Furnace Project**

Allied was only required to perform structural removal in connection with the Great Lakes C3 Furnace Project and had no contractual obligation to remove the concrete foundations. Thus, U.S. Steel breached the 2010 DSA and the relevant contract documents for the Great Lakes C3 Furnace project by refusing to pay Allied's Invoice #00014711 in the amount of $240,388.00.

**2. Gary Demobilization**

Allied also claims that under Section 3(H) and Attachment 3 of the 2010 DSA, it is entitled to the recovery of its costs of demobilization subsequent to the completion of the Gary Open Hearth

Structural Failure project. Because Allied completed numerous last look projects at Gary and is not entitled to demobilization costs for such last look projects, Allied has not met its burden that it charged U.S. Steel only for compensable negotiated projects. Moreover, Allied failed to introduced evidence that would allow the Court to distinguish between negotiated projects for which Allied was entitled to compensation and non-compensable last look projects.

For these reasons, Allied's damages claim is impermissibly speculative. Therefore, Allied is not entitled to recover damages for this claim.

### 3. Great Lakes #2 Coke Battery Screening Station

With respect to the Great Lakes #2 Coke Battery Screening Station project, U.S. Steel breached the terms of the 2010 DSA and the relevant contract documents by refusing to either pay Allied $28,412.00 on its Invoice No. 00016231 or setoff these amounts in the bankruptcy. Allied is entitled to recover this amount from U.S. Steel.

### E. Count V

By not permitting Allied to remove its accumulated scrap, U.S. Steel breached the 1992 FCS and the 2003 AIP. Allied owned all of the scrap generated as a result of its work at Fairless. Contrary to U.S. Steel's contention, there was no evidence that Allied abandoned or intended to abandon the scrap it generated.

It was uncontroverted that the majority of the scrap was generated in 2013, and therefore, even if the FCS is read to require that scrap must be removed within twelve months of its generation, Allied had the right to remove scrap within the time frame at issue. To the extent that some of the scrap was generated prior to 2013 and the FCS can be read to require its removal within one year, U.S. Steel's course of performance does not support a finding that it required removal within one year of each phase such that any scrap not so removed would be considered

"abandoned." *Commonwealth v. UPMC*, 129 A.3d 441, 464 (Pa. 2015) ("a party's performance under the terms of a contract is evidence of the meaning of those terms." (citing *Atlantic Richfield v. Razumic*, 390 A.2d 736, 741 n.6 (Pa. 1978)).

With respect to damages, neither Allied nor U.S. Steel weighed the scrap at Fairless so actual weights of the scrap were unavailable. As the evidence demonstrated, the scrap sold to Sims did not account for all of the scrap owned by Allied. Mr. Lindquist, an experienced estimator, explained his methodology of estimating the scrap at Fairless. He used the same methodology in other U.S. Steel projects. He also compared his findings with a U.S. Steel document regarding the volume of scrap purchased by Sims and credibly testified that it did not cover all of the areas and materials addressed in his estimate. This contemporaneous estimate, which was supported by photographs, is neither too speculative nor based on conjecture.

Mr. Anness's calculation of Allied's lost profits in the amount of $1,387,475.00 was reasonable. Allied is entitled to recover from U.S. Steel its lost profits in the amount of $1,387,475.00.

Allied asserts that it is entitled to interest, penalty interest, and attorney's fees for U.S. Steel's breach of the 2003 AIP and the FCS under the Pennsylvania Contractor and Subcontractor Payment Act ("CASPA"), 73 P.S. § 501 *et seq*. (ECF No. 197 §§ 65–68.) U.S. Steel contends that CASPA only applies to issues of nonpayment or untimely payments for construction work in Pennsylvania and is therefore inapplicable. (ECF No. 200 §§ 143–156.)

"CASPA applies to a 'construction contract,' which is defined as an 'agreement, whether written or oral, to perform work on any real property located within this Commonwealth.'" *Prieto Corp. v. Gambone Constr. Co.*, 100 A.3d 602, 607 (Pa. Super. 2014). While 2003 AIP and FCS may be construction contracts, *see id.* (explaining CAPSA's defined terms "real property,"

"improved" and "improvement"), Count V "does not involve a claim of non-payment brought under the C[A]SPA." *Stivason v. Timberline Post & Beam Structures Co.*, 947 A.2d 1279, 1284 (finding that although the litigation involved a contract for construction in Pennsylvania, CAPSA did not apply to claims breaches of warranty and violations of the Unfair Trade Practices and Consumer Protection Law arising from a leaky roof). In interpreting the CAPSA, the Court looks at its plain language and "construe[s] words and phrases according to their 'common and approved' usage" and "as appropriate, their 'peculiar and appropriate' or statutorily provided meanings" and "with reference to the context in which the words appear." *Scungio Borst & Assocs. v. 410 Shurs Lane Developers, LLC*, 146 A.3d 232, 238 (Pa. 2016) (citations omitted).

Assuming that the 2003 AIP and FCS are construction contracts, the U.S. Steel's breach of such—by not permitting Allied to remove its accumulated scrap—is not one that involves a claim of non-payment under CAPSA. Under the FCS, Allied owned the scrap, was entitled to sell the scrap, subject to U.S. Steel's right of refusal for a certain price—no terms of payments, other than the price per ton, are outlined. (Ex. 2 §§ 5, 12.) Similarly, the 2003 AIP provides that Allied owns the scrap and may sell the scrap, subject to U.S. Steel's right of first refusal based on the lower of two amounts. (Ex. 3 §§ II(B)(2), (7)-(8).) While the FCS outlines the exact specifications of works to be undertaken, the 2003 AIP is one step removed from any anticipated construction. Instead of detailing construction specifications, the 2003 AIP requires U.S. Steel to offer work to Allied over 36 months to generate $7,000,000 in profit/gross margin. (*Id.* §§ II(B)(1)-(2).) Other than the initial non-refundable advance, (*id.* § II(B)(1)), the 2003 AIP merely outlines the *method* to calculate the profit/gross margins, including for the works at Fairless. (*Id.* §§ II(A)–(B).) However, the 2003 AIP does not provide any terms for such payments (such as timing, amount, or conditions precedent). (*Id.*)

Although, as addressed above, the scrap had a value, Allied's claims based on this scrap are not those envisioned by the plain language of the CAPSA. CAPSA "provides for the timely payment of contractors and subcontractors, imposing penalties where an owner or general contractor fails to comply with payment provisions therein." *Quinn Constr. v. RC Dolner LLC*, 187 F. App'x 129, 130 (3d Cir. 2006) (citing 73 P.S. § 504). Under CAPSA, an owner must "pay the contractor strictly in accordance with terms of the construction contract." 73 P.S. § 505(a). In the absence of "a term governing the terms of payment, the contractor shall be entitled to invoice the owner for progress payments at the end of the billing period" and a "final invoice for payment in full upon completion of the agreed-upon work." 73 P.S. § 505(b). CAPSA also provides the timing for contract payments, the rate and timing of interest payments, and circumstances under which a party may suspend their obligations under CAPSA. 73 P.S. §§ 505(c)–(e), § 506. CAPSA provides penalties and attorney's fees for the failure to comply with payment terms of CAPSA. 73 P.S. § 512. Under the terms of the CFS and the 2003 AIP,[11] Allied had the opportunity—but not the obligation—to sell the scrap and could do so subject to U.S. Steel's right of first refusal. This contractual provision is far removed from the provisions of CAPSA requiring timely payment in construction contracts.

Finally, even if CAPSA were to apply, Allied's claim for interest, interest penalty, and attorney's fees still fails as there is no evidence in the record of the required invoices under Section 505(b), because the contracts, as discussed above, do not contain the terms of payment.

---

[11] U.S. Steel also contends that CAPSA is inapplicable to the 2004 AIP. ECF No. 200 §§ 149, 151. The mechanics of both agreements are substantially similar, such that the Court's analysis applies equally to the 2004 AIP. *Compare* Ex. 3 §§ II(A)–(B) *with* Ex. 5 §§ II(A)–(B).

## V.    Prejudgment Interest

Pennsylvania has adopted Section 354 of the Restatement of Contracts with respect to the award of prejudgment interest.  Pursuant to Section 354(1), prejudgment interest is only awarded as a matter of right with respect to contract damages ascertainable from the terms of the contract.  *Cresci Construction Services, Inc. v. Martin*, 64 A.3d 254, 260 (Pa. Super. 2013).  Otherwise, an award of prejudgment interest is discretionary.  *Id. See also TruServ Corp. v. Morgan's Tool and Supply Co.*, 39 A.3d 253, 264-65 (Pa. 2012).

U.S. Steel contends that Allied is not entitled to prejudgment interest, because Allied's claimed damages are neither liquidated nor ascertainable, and requests supplemental briefing on the applicability, appropriateness, and amount of any prejudgment interest.  (ECF No. 202 ¶¶ 14-15 (citing *Cresci Const. Servs., Inc. v. Martin*, 64 A.3d 254, 264 (Pa.Super.Ct. 2013).)  Allied's damage calculations included prejudgment interest calculated through December 31, 2020.  Because matters relating to prejudgment interest remain to be determined, the Court is ruling on liability and damages as to each Count, but such ruling is exclusive of any prejudgment interest award.  A separate order will be issued for the parties to address the issue of prejudgment interest with respect to each of the claims for which the Court has found in Allied's favor, as summarized below.

## VI.    Conclusion

For the reasons set forth herein, the Court finds in favor of Allied and against U.S. Steel in with respect to the following claims and in the following amounts, exclusive of interest.

1.  Count 1 as to the following projects:
    - Great Lakes/Zug Island Sulfate Building (Phase 4, Part B): $120,356.00
    - Granite City Baghouse Platform: $13,966.00
    - Port Perry COG Pipeline Removal: $77.609.00
    - Clairton C-3064 Flushing Liquor Surge Tank: $19,420.00

- Great Lakes/Zug Island Crusher Screening Building and Conveyor Junction House: $276,015.00

2. Count II in the amount of $915,314.00

3. Count III as to the following projects:
   - Great Lakes Sulphate Building, Change Order Request No. 1: $14,645.64

   - Gary #7 Blast Furnace Stockhouse Bins
     Change Order Request No. 1: $39,560.00
     Change Order Request No. 2: $18,340.00
     Change Order Request No. 3: $28,132.00

   - Minntac
     Change Order Request No. 2: $14,717.00
     Scrap value: $564,355.00

4. Count IV as to the following projects:
   - Great Lakes C3 Furnace Project: $240,388.00
   - Great Lakes #2 Coke Battery Screening Station: $28,412.00

5. Count V in the amount of $1,387,475.00

The Court finds in favor of U.S. Steel and against Allied with respect to the following claims:

1. Count I
   - Dust Storage Silo at Granite City
   - No. 2 Boiler House Coke Oven Gas Line and Removal at Gary
   - Fairfield QBOP Area Demo
   - Granite City Blooming Mills Stacks
   - Clairton T62 Light Oil Tank
   - Great Lakes #2 Byproducts Scrubbers
   - Clairton Screening Station Removal
   - Edgar Thompson Slag Processing Roof Sheeting

2. Count III
   - Great Lakes Sulphate Building, Change Request Order No. 2
   - Great Lakes Ore Dock Trestle
   - Great Lakes 36 Inch COG Line Removal
   - Great Lakes #2 Coke Battery Screening Station
   - Minntac, Change Order Request Nos. 1 and 4

3. Count IV
   - Gary Demobilization

A separate order will be issued regarding further proceedings, including the determination of pre-judgment interest.

Dated: September 29, 2022        BY THE COURT:

PATRICIA L. DODGE
United States Magistrate Judge